# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

—————————————

N⁰ 05-CV-0230 (JFB) (MDG)

—————————————

ZINOVIY LEVITANT,

Plaintiff,

VERSUS

THE CITY OF NEW YORK HUMAN RESOURCES ADMINISTRATION D/B/A HUMAN RESOURCES ADMINISTRATION,

Defendant.

—————————————

**MEMORANDUM AND ORDER**
December 18, 2008

—————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Zinoviy Levitant ("plaintiff" or "Levitant") brought this action on January 14, 2005 against his former employer, defendant City of New York Human Resources Administration ("defendant" or "Human Resources"), alleging that defendant discriminated against him on the basis of race and national origin in the terms and conditions of his employment, subjected him to a hostile work environment, and retaliated against him for reporting said discrimination to the Equal Employment Opportunity Commission ("EEOC"), all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

Defendant now moves for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, after carefully reviewing the record in this case, viewing all facts in the light most favorable to plaintiff and drawing all reasonable inferences therefrom, the Court denies defendant's motion in its entirety. Specifically, there are genuine issues of material fact regarding whether defendant's alleged discriminatory actions created a hostile work environment, whether defendant's proffered reasons for failing to promote plaintiff were a pretext for race and national origin discrimination, and whether various adverse employment actions taken against plaintiff were in retaliation for the complaints he filed about the alleged discrimination. Accordingly, defendant's motion for summary judgment on plaintiff's Title VII claims is denied.

## I. FACTS[1]

The Court has taken the facts described below from the plaintiff's complaint ("Compl."), the parties' depositions, affidavits, and exhibits, defendant's Local Rule 56.1 statement of facts ("Def.'s 56.1") and plaintiff's Local Rule 56.1 statement of facts ("Pl.'s 56.1"). In ruling on a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### A. Plaintiff's Tenure with the Brooklyn APS Unit

Beginning on February 8, 1993, defendant employed plaintiff, a Caucasian male of Russian origin, as a case worker for the Child Welfare Administration, also known as the Administration for Children's Services or "ACS." (Def.'s 56.1 ¶¶ 1, 3.) In December of 2000, plaintiff was transferred from ACS to the Adult Protective Services ("APS") field office in Brooklyn. (*Id.* at ¶ 5.) There, he was transferred from the "Assessment Unit" to the "Undercare Unit." (Compl. ¶ 17.) Plaintiff maintains that, on or about the time of the transfer, he was the victim of racial discrimination based on the assignments designated to him and the manner in which supervisors discussed his Russian accent. (*Id.* at ¶ 16.) He further alleges that, when he requested a transfer back to the Assessment Unit, supervisor Eileen Anderson denied his request, citing a waiting list, but placed less experienced African-American employees in the desired unit. (*Id.* at ¶ 18.)

From 2001 until 2003, plaintiff was supervised by Martha Barnes and Martin Agwuncha. (Def.'s 56.1 ¶ 7.) He also was supervised by Eileen Anderson, as Director of Brooklyn APS, Deborah Holt-Knight as Deputy Director of Brooklyn APS, Urdine Kennedy as a Level III Supervisor and Sandra Brown as a Level II Supervisor. (*Id.* at ¶ 8.)

In January and April of 2001, Agwuncha informed Holt-Knight that he was having difficulty training plaintiff because he was resistant to supervision and engaged in harassing behavior. (*Id.* at ¶¶ 9-10.) On May 29, 2001, supervisor Barnes issued a "Certificate of Achievement" to plaintiff for "outstanding performance and initiative." (Pl.'s Ex. B.) On August 29, 2001 and December 7, 2001, plaintiff received counseling memoranda for: (1) leaving the work site without authorization; (2) lying and insubordination; and (3) conducting union activities during working hours. (Def.'s 56.1 ¶¶ 11-12.)[2] These memoranda asserted that plaintiff had been observed taking lengthy, unauthorized smoking breaks and socializing with employees on another floor during work hours. (*Id.*)

Beginning in early 2002 and continuing through June of the same year, plaintiff alleges that supervisor Kennedy disparaged him by referring to him as a "Russian" and a "Jew." (Compl. ¶ 19; Levitant 4/28/06 Dep. at 108-09, 132-33.) He further charges that during this same year, he approached supervisor Kennedy about the lack of

---

[1] Where only defendant's 56.1 Statement is cited, the facts are taken from defendant's 56.1 statement, and plaintiff does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

[2] These charges, along with a host of others, came before Administrative Law Judge John B. Spooner on September 4, 2004. Judge Spooner dismissed twenty-six of the thirty charges, including these three. (Pl.'s Ex. C, at 5-6.)

drinking water in the office, to which she responded "'that plaintiff can go and drink water from the toilet – you Russians did that in the past.'" (Compl. ¶ 20; Levitant 4/28/06 Dep. at 142-43.)

Plaintiff received another counseling memorandum on June 25, 2002 for insubordination and failure to complete mandated field visits. (Def.'s 56.1 ¶ 14.) These charges stemmed from an incident that took place on June 25, 2002, wherein supervisor Kennedy ordered plaintiff to meet with her and supervisor Anderson in Kennedy's office to discuss his objectionable behavior towards her when she sought to discuss a client visit with plaintiff. (Def.'s Ex. J.) Plaintiff and defendants dispute the events that actually transpired thereafter, but ultimately, Human Resources brought disciplinary charges against plaintiff on August 7, 2002 for: (1) engaging in threatening and intimidating behavior towards supervisor Anderson; and (2) leaving the work site without authorization after his encounter with Anderson and Kennedy. (Def.'s 56.1 ¶ 18.)[3]

### 1. Plaintiff's First EEO Complaint

Plaintiff maintains that Anderson assaulted him during the June 25, 2002 incident and that she did so in retaliation for three complaints of race discrimination that he allegedly filed with the Agency prior to this date regarding Kennedy's racially disparaging statements. (Compl. ¶¶ 21-22.) A careful review of the evidence submitted by both parties, though, indicates that plaintiff filed his first complaint with the City New York Office of Equal Employment Opportunity ("EEO") in August of 2002, *after* the alleged assault and no charge of discrimination was contained therein. In the complaint, plaintiff charged that Agency management had: (1) subjected him to unsanitary work conditions; (2) retaliated against him for conducting union activities; and (3) behaved rudely towards him. (Def.'s 56.1 ¶ 21; Def.'s Ex. U.)[4] On September 10, 2002, Lilla Sexton, Director of the EEO office, informed plaintiff via memorandum that his claims did not fall within the criterion of EEO protected classes. (Def.'s 56.1 ¶ 23.)

On July 9, 2003, July 18, 2003 and July 28, 2003, plaintiff filed three separate grievances with his union alleging that Agency management had behaved in a hostile manner towards him. (*Id.* at ¶¶ 28-30.)

---

[3] Administrative Law Judge Spooner dismissed the first charge and noted in his opinion that plaintiff was entitled to have a union representative present at the meeting that Kennedy had ordered on June 25, 2002. (Def.'s 56.1 ¶ 18; Pl.'s Ex. C, at 13.) Judge Spooner upheld the charge of leaving the work site without authorization on that date, as well as another such charge filed against plaintiff on July 11, 2002. (Pl.'s Ex. C, at 13; Def.'s 56.1 ¶ 17.) Judge Spooner ordered a penalty of twenty days suspension without pay on the recommendation of a hearing officer who had reviewed the charges against plaintiff at an informal conference on September 9, 2002. (Pl.'s Ex. C; Def.'s 56.1 ¶ 19.)

[4] Plaintiff submits in his Local Rule 56.1 statement of facts that his August 2002 EEO complaint also contained an allegation of race discrimination, (Pl.'s 56.1 ¶ 21), but after carefully reviewing the complaint, filed as Def.'s Ex. U, the Court finds no evidence of any such charge contained therein.

On August 8, 2003, supervisor Brown issued a counseling memorandum to plaintiff asserting that on that day, when seeking to meet with plaintiff in Brown's office, plaintiff threatened her and refused to meet with her to discuss his work performance. (*Id*. at ¶ 31.) Brown also reported plaintiff's alleged conduct to supervisor Anderson and filed a police report about the alleged threatening behavior. (*Id*. at ¶¶ 32-33.)[5] Plaintiff maintains that, during the incident giving rise to the counseling memorandum, supervisor Brown assaulted him and that on that same day, supervisor Barnes mocked his Russian accent and stuck her fingers in his face in a threatening manner. (Compl. ¶ 26; Levitant 4/28/06 Dep. at 118-19; Levitant 6/28/06 Dep. at 247).

### 2. Plaintiff's Internal Complaints

On August 12, 2003, plaintiff filed an internal complaint against supervisor Anderson, alleging that she created a hostile work environment in retaliation for previous complaints he had filed regarding unsanitary work conditions and racial discrimination. (Def.'s 56.1 ¶ 38.) The evidence submitted by both parties indicates that, as of August 12, 2003, plaintiff had not yet filed any complaints alleging racial discrimination.

Plaintiff took sick leave from August 11, 2003 through August 18, 2003. (*Id*. at ¶ 35.) He then took a previously-approved vacation from August 18, 2003 until September 9, 2003. (*Id*. at ¶ 39.) He requested medical leave from September 10, 2003 until October 3, 2003, requested annual leave for October 6, 2003 and returned to work for the first time since the August 8, 2003 incident on October 7, 2003.

(*Id*. at ¶ 40.) He was then suspended for his conduct during the August 8, 2003 incident until October 26, 2003. (*Id*. at ¶ 41.)

### B. Plaintiff's Reassignment to the Lombardi Unit

On or about November 3, 2003, plaintiff was reassigned from the APS Unit to the Home Care Lombardi Unit in Manhattan. (*Id*. at ¶ 47.) On November 12, 2003 and December 3, 2003, plaintiff's new supervisor, Debora Daniel-Preudhomme, issued counseling memoranda to plaintiff informing him that he was not permitted to handle personal or union business during work hours. (*Id*. at ¶¶ 50-51.) Plaintiff maintains that "at this time and at this location," supervisor Daniel-Preudhomme threatened to arrest him "if [he] spoke in his native Russian language in the office and on the telephone." (Compl. ¶ 36.) Specifically, plaintiff alleges that "[Daniel-Preudhomme] heard me answering my cell phone. I had a family call during my lunch hour to my cell phone. She told me if she heard me again talking Russian on the phone she'll have the security remove me and throw me out." (Levitant 7/5/06 Dep. at 105.)

On December 5, 2003, plaintiff filed another EEO complaint against Anderson, alleging that she retaliated against him for filing his first EEO complaint against her by refusing to allow him to return to the Brooklyn APS program. (Def.'s 56.1 ¶ 52.) By memorandum dated December 29, 2003, Lilla Sexton at the EEO informed plaintiff that his complaint did not fall within the criterion of EEO protected classes or categories, nor did the description of events depict employment discrimination. (*Id*. at ¶ 53.)

---

[5]   The charge of misconduct stemming from plaintiff's alleged threats towards Brown was upheld by Judge Spooner. (Pl.'s Ex. C.)

On or about January 1, 2004, plaintiff's union, District Council 37 ("the Union") filed a Verified Improper Practice Petition against the Agency asserting that plaintiff had been served with false disciplinary charges and had been intimidated by his supervisors in retaliation for his activities as a union representative. (*Id*. at ¶ 54.)

On January 12, 2004, plaintiff was served with disciplinary charges alleging that he: (1) committed various incidents of insubordination; (2) made false entries on Agency documents; (3) violated Agency leave policies; and (4) used obscene and inappropriate language with a supervisor. (*Id*. at ¶ 59.) On February 13, 2004, plaintiff was counseled for violating Agency rules regarding unauthorized breaks and adherence to supervision. (*Id*. at ¶ 56.) On February 18, 2004, supervisor Daniel-Preudhomme requested that disciplinary action be taken against plaintiff for his failure to adhere to directives regarding the aforementioned violations. (*Id*. at ¶ 58.) On March 12, 2004, Bridget M. Simone, Director of the Home Care Unit, informed plaintiff that: (1) he should attend scheduled meetings; (2) he should not engage in union activities during business hours; (3) he should not use his telephone for personal conversations; (4) he should conduct all business conversations in English; (5) he should not distract fellow employees with conversations unrelated to work; and (6) he should not threaten other employees with lawsuits. (Def.'s Ex. GGG.) Plaintiff maintains that, during March of 2004, he was threatened with disciplinary action if he spoke in his native Russian while other employees were permitted to speak Spanish. (Compl. ¶ 40; Levitant 7/5/06 Dep. at 106: 7-16.)

C. Plaintiff's EEOC Complaints

On February 20, 2004, plaintiff filed charges of retaliation for protected activity and national origin discrimination with the EEOC's New York District Office, alleging that: (1) supervisor Anderson retaliated against him for filing an EEO complaint against her in 2002; (2) supervisor Barnes mocked his accent and stuck her fingers in his face on August 8, 2003; and (3) supervisor Daniel-Preudhomme prohibited him from speaking Russian in the workplace. (Def.'s 56.1 ¶ 60; Def.'s Ex. 8.) Specifically, regarding the last charge, he alleged in the EEOC complaint that supervisor Daniel-Preudhomme stated: "I have heard you speaking in *Russian* on the phone. I don't want to hear this language anymore." (Def.'s Ex. 8 (emphasis in original).)

On March 22, 2004, plaintiff filed another petition with the Union, alleging that he had been mistreated on account of his union activities. (Def.'s 56.1 ¶ 55.) On or about March 24, 2004, after passing a civil service exam, plaintiff was interviewed for a Supervisor I position by supervisors Anderson and Brown. (Def.'s 56.1 ¶ 64; Pl.'s 56.1 ¶ 65.) At the time of his interview, plaintiff had several disciplinary charges pending and defendant maintains that, according to Agency policy, any individual with such pending charges is not eligible for promotion. (Def.'s 56.1 ¶¶ 65-66.) Plaintiff was not selected for promotion. (*Id*. at ¶ 67.) Plaintiff contends that the supervisor position he sought was filled by an African-American female with lesser qualifications and pending disciplinary charges. (Plaintiff's Memorandum of Law, at 8; Eileen Anderson Tr. at 1192-93.)

Plaintiff filed a second charge of discrimination with the EEOC on July 13,

2004, reiterating the claims detailed in his February 20, 2004 complaint. (Def.'s 56.1 ¶ 68.) Plaintiff further alleged that he was denied the promotion to a Supervisor I position on account of his national origin. (*Id.*) By letter dated October 20, 2004, the EEOC informed plaintiff that his complaint "fail[ed] to indicate that a violation has occurred" and further concluded that there was "no evidence to indicate that national origin played any role in the employment actions taken against [him]." (*Id.* at ¶ 71; Def.'s Ex. 11.) Plaintiff commenced the instant action on January 14, 2005. On May 12, 2005, plaintiff then filed a third charge of discrimination with the EEOC alleging that his supervisors had retaliated against him for filing his previous EEOC complaints by bringing further disciplinary charges against him. (Def.'s 56.1 ¶¶ 74-75; Def.'s Ex. 12.) By letter dated August 2, 2005, the EEOC informed plaintiff that he did not establish a violation of any of the statutes enforced by the agency. (Def.'s 56.1 ¶ 76; Def.'s Ex. KKK.)

## D. Plaintiff's Termination

Plaintiff was absent from work from August through November 2005 on disability leave. (Def.'s 56.1 ¶ 78; Pl.'s 56.1 ¶ 78.) By letter dated November 3, 2005, the Agency informed him that, as a physician had deemed him fit to perform his duties, he was to return to the office on November 21, 2005. (Def.'s 56.1 ¶ 79.) On December 12, 2006, the Agency informed plaintiff by letter that, since he had been absent without official authorization since November 21, 2005, disciplinary charges would be filed against him if he did not resign. (*Id.* at ¶ 80.) Plaintiff did not resign and was served with additional charges for violations of Agency policies in early 2006. (*Id.* at ¶¶ 81-82.) Following a hearing on these charges held pursuant to Section 75 of the Civil Service Law on February 2, 2007, Administrative Law Judge Tynia D. Richard recommended termination. (*Id.* at ¶ 83.) Plaintiff was terminated from his position with the Agency on March 6, 2007. (*Id.* at ¶ 84.)

## II. PROCEDURAL HISTORY

Plaintiff filed this action on January 14, 2005. Defendants answered the complaint on September 8, 2005 and filed the instant motion on March 31, 2008. Plaintiff submitted his opposition on August 21, 2008. Defendant submitted its reply on September 16, 2008. Oral argument was held on December 3, 2008. On December 8, 2008, as discussed at oral argument, plaintiff submitted a supplemental letter on the "failure to promote" claim. Defendant responded to that letter on December 16, 2008. The Court has fully considered the submissions of both parties.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew

credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment." *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (*quoting Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. Discussion

### A. Timeliness of Claims

As a threshold matter, defendant contends that, because plaintiff did not file his first complaint alleging discrimination until February 20, 2004, any claims of discrimination which occurred prior to April

26, 2003, 300 days before he filed that complaint with the EEOC, are time barred and should be dismissed. Thus, defendant asserts that the following claims/incidents should be dismissed as time-barred: (1) on or around December of 2000, defendant discriminated against him based on his race by giving him certain assignments, discussing his accent and refusing to transfer him to his desired unit; (2) in early 2002 through June of 2002, supervisor Kennedy spoke to him in a disparaging manner about his national origin; and (3) on August 3, 2002, supervisor Barnes mocked his Russian accent.

As set forth below, the Court concludes that any separate discrimination claim based on a failure to transfer in 2000 is time-barred. However, as confirmed at oral argument, the other above-referenced incidents are being asserted as part of an alleged continuous hostile work environment that commenced during this earlier time period and continued until plaintiff's termination. Therefore, based upon the well-settled "continuing violation" doctrine under Title VII for hostile work environment claims, these alleged earlier incidents can be considered as part of such claim.

### 1. Legal Standard

Prior to filing a Title VII claim in federal court, a plaintiff must institute proceedings with a state or local agency within 300 days of the alleged act of discrimination. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. (AMTRAK) v. Morgan*, 536 U.S. 101, 108-09 (2002) ("In the context of a request to alter the timely filing requirements of Title VII, this Court has stated that 'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'") (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)); *see also Ledbetter v. Goodyear Tire & Rubber Co.*,

*Inc.*, 550 U.S. 618 (2007). These statutory filing periods are "analogous to [ ] statute[s] of limitations," *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996), and, as such, "a failure to timely file a charge acts as a bar to a plaintiff's action." *Butts v. N.Y. City Dep't of Hous. Pres. & Dev.*, No. 00 Civ. 6307 (KMK), 2007 U.S. Dist. LEXIS 6534, at *20 (S.D.N.Y. Jan. 29, 2007) (citing *Hill v. Citibank Corp.*, 312 F. Supp. 2d 464, 472 (S.D.N.Y. 2004)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006). This "statute" of limitations begins to run for each discrete discriminatory or retaliatory act when each act occurs. *See Morgan*, 536 U.S. at 114; *Hill*, 312 F. Supp. 2d at 472. Accordingly, claims that allege Title VII violations which occurred 300 days or more prior to August 12, 2003, the date that plaintiff first alleged that he was the victim of race and national origin discrimination, generally would be time-barred.

Plaintiff argues that all of his claims are timely because, as a part of a hostile work environment, they constitute a "continuing violation." In order to invoke the "continuing violation" exception, plaintiff must demonstrate that separate incidents were a part of a larger unlawful employment practice and, therefore, any one of those incidents occurring within the mandatory 300-day filing period necessarily implicates those that preceded it. *See Morgan*, 536 U.S. 101, 115-21 (2002); *see also Quinn v. Green Tree Credit Corp*, 159 F.3d 759, 766 (2d Cir. 1998) ("a continuing violation may be found 'where there is proof of specific ongoing discriminatory polices [sic] or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice'") (quoting *Cornwell v. Robinson*,

23 F.3d 694, 704 (2d Cir. 1994)), *abrogated in part on other grounds*; *Morgan*, 536 U.S. 101. Accordingly, in the case of plaintiff's hostile work environment claim, "the statute of limitations requires that only one . . . harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider 'the entire time period of the hostile environment' in determining liability." *Petrosino v. Bell Atl.*, 385 F.3d at 220 (quoting *Morgan*, 536 U.S. at 117); *see also Linder v. City of New York*, 263 F. Supp. 2d 585, 594 (E.D.N.Y. 2003) (denying motion to dismiss hostile work environment claim where plaintiff was sexually assaulted by a co-worker prior to the statutory time period, but was subjected to retaliatory acts and was forced to work in close proximity to her assailant within 300 days of the date on which plaintiff filed her EEOC complaint).

However, as the Supreme Court observed in *Morgan*, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113; *see Petrosino*, 385 F.3d at 220 ("The law is clear that termination and promotion claims may not be based on discrete acts falling outside the limitations period."); *Butts*, 2007 U.S. Dist. LEXIS 6534, at \*22-23; *see also Sudaram v. Brookhaven Nat'l Lab.*, 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006) ("[T]he exception does not apply to discrete, completed employment actions such as transfers, failures to promote, demotions, or inadequate wages.") (citations omitted).

2. Application[6]

Other than the denial of transfer, the alleged incidents that defendant argues are time-barred – namely, (1) on or around December of 2000, defendant discriminated against him based on his race by giving him certain assignments and discussing his accent; (2) in early 2002 through June of 2002, supervisor Kennedy spoke to him in a disparaging manner about his national origin; and (3) on August 3, 2002, supervisor Barnes mocked his Russian accent – all relate to plaintiff's hostile work environment claim. In addition to these incidents, plaintiff also relies upon evidence to support that claim that occurred within the applicable time limitations, including allegations that in late 2003 he was told by his supervisor that he could not speak in Russian on the telephone with respect to personal calls to his family. Therefore, for purposes of considering plaintiff's hostile work environment claim,

_____

[6] The Court notes that, although plaintiff filed his first claim alleging discrimination on the basis of race on February 20, 2004, he filed an internal complaint on August 12, 2003, alleging retaliation for filing an earlier complaint charging that supervisor Anderson discriminated against him on the basis of his race. Though the evidence submitted by both parties indicates that plaintiff never raised discrimination in the earlier complaint against Anderson, the reference to discrimination in the August 2003 internal complaint constitutes a claim of discrimination for purposes of considering issues of timeliness and any alleged retaliation. Accordingly, any discrete acts of discrimination that occurred after October 17, 2002 (which is 300 days before August 12, 2003) would be timely. In any event, since no discrete acts of discrimination are alleged to have taken place between October 17, 2002 and April 26, 2003 (which is 300 days prior to February 20, 2004), the use of this earlier date is not critical on any issues of timeliness.

the pre-October 17, 2003 incidents referenced above (other than the denial of transfer) are not time-barred and will be considered in the Court's review of plaintiff's hostile work environment claim.

With respect to the alleged unlawful transfer in December 2000, it is well-settled that the denial of a transfer is a discrete employment action to which the "continuing violations" exception for a "hostile work environment" claim does not apply. *See Morgan*, 536 U.S. at 114; *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004). Therefore, the alleged failure to transfer in December 2000 is time-barred.

## B. Hostile Work Environment

Plaintiff claims that defendant subjected him to a hostile work environment when Agency supervisors disparaged his national origin, mocked his Russian accent, instructed him not to conduct telephone calls in his native Russian, and monitored him excessively. Defendants contend that summary judgment is warranted on this claim because, even if the jury credited plaintiff's evidence with respect to these allegations, no rational jury could find that the alleged conduct was sufficiently severe or pervasive to constitute a hostile work environment, nor that the alleged hostile work environment was attributable to plaintiff's race or national origin. As set forth below, the Court disagrees and concludes, after a careful review of the evidence in the record, drawing all reasonable inferences in plaintiff's favor, that there are genuine issues of fact that preclude summary judgment on whether plaintiff was subjected to a hostile work environment based upon his race and national origin.

### 1. Legal Standard

In order to prevail on a hostile work environment claim, a plaintiff must demonstrate that his workplace is "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998)); *see Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004); *see also Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)*; Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003); *Richardson v. N.Y. Dep't of Corr. Servs.*, 180 F.3d 426, 437 (2d Cir. 1999). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

The Second Circuit has held that there is no "magic" threshold number of harassing incidents that are required, as a matter of law, to demonstrate a hostile work environment. *See Richardson*, 180 F.3d at 439. Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley*, 217 F.3d at 154 (quoting *Harris*, 510 U.S. at 23); *see also Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir. 1989)); *see, e.g., Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) (noting that "[i]solated incidents of offensive

conduct (unless extremely serious) will not support a claim of discriminatory harassment") (citation omitted); *Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002) (finding the alleged conduct non-actionable when the incidents were "too few, too separate in time, and too mild . . . to create an abusive working environment"); *Trinidad v. N.Y. City Dep't of Corr.*, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a "bitch" and making sexual remarks over the course of her five and one-half years of employment insufficient to support a claim of discriminatory harassment); *Augustin v. Yale Club of N.Y.C.*, No. 03 Civ. 1924 (KMK), 2006 WL 2690289 (S.D.N.Y. Sept. 15, 2006) (finding that "four or five" comments over a five-year period insufficient to support a hostile work environment claim); *Mark v. Brookdale Univ. Hosp.*, No. 04 Civ. 2497 (JBW), 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (finding two "alleged isolated remarks" by plaintiff's supervisor insufficiently "frequent and pervasive"); *Pagan v. N.Y.S. Division of Parole*, No. 98 Civ. 5840 (FM), 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding that two racially derogatory remarks by supervisor directly to plaintiff did "not amount to the sort of 'extremely serious' behavior required to give rise to a hostile work environment under Title VII") (citations omitted); *Hawana v. City of New York*, 230 F. Supp. 2d 518, 533 (S.D.N.Y. 2002) (finding single remark by supervisor insufficient); *Upshur v. Dam*, No. 00 Civ. 2061 (DC), 2003 WL 135819, at *7-8 (S.D.N.Y. Jan. 17, 2003) (finding one week of "patronizing and racist comments" by supervisor insufficient); *Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 335 (S.D.N.Y. 2002) (finding that supervisor's use of racially derogatory slur to refer to defendant on four or more occasions does not alter conditions of employment significantly enough to implicate Title VII).

2. Application

In the instant case, plaintiff has pointed to several pieces of evidence to support his hostile work environment claim. First, plaintiff has provided evidence that a number of remarks were made to him regarding his race and/or national origin that resulted in a hostile work environment. In particular, plaintiff has testified to the following incidents: (1) beginning in early 2002 and continuing through June of the same year, plaintiff alleges that supervisor Kennedy disparaged him by referring to him as a "Russian" and a "Jew" (Compl. ¶ 19; Levitant 4/28/06 Dep. at 108-09, 132-33); (2) during that same year, he approached supervisor Kennedy about the lack of drinking water in the office, to which she responded "'that plaintiff can go and drink water from the toilet – you Russians did that in the past.'" (Compl. ¶ 20; Levitant 4/28/06 Dep. at 142-43); and (3) in August 2003, during an incident giving rise to the counseling memorandum, supervisor Brown assaulted plaintiff and, on that same day, supervisor Barnes mocked his Russian accent and stuck her fingers in his face in a threatening manner.[7] (Compl. ¶ 26; Levitant

---

[7]   Although defendant argues that the phrase "yap, yap, yap" does not constitute a discriminatory term related to plaintiff's national origin or race (Defendant's Memorandum of Law, at 9), plaintiff testified that the supervisor was mocking his accent in the conversation: "She was waving her fingers before my eyes, she was laughing in my face the way I talk with an accent. She an American; I'm a foreigner. It was pretty un-understandable for me why she do that . . . . She was mocking my accent, like this (indicating)." (Levitant 7/5/06 Dep. at 247.) The Court concludes that, in the context of the conversation and the entire record, drawing all reasonable inferences in favor of plaintiff, a

4/28/06 Dep. at 118-19; Levitant 6/28/06 Dep. at 247.)

Although defendants argue that these comments are too isolated to establish a hostile work environment, the Court must also consider the other evidence offered by plaintiff. Specifically, plaintiff offers evidence that Director Daniel-Preudhomme twice forbade him from speaking in his native language in the workplace, once, in late 2003, while plaintiff was conducting a personal telephone call during his lunch hour and, again in early 2004, at which time she threatened to pursue disciplinary charges against him for speaking Russian. Plaintiff further contends that, while he was not permitted to speak his native language, other employees were conversing in Spanish without consequence.

In response to this evidence, defendant contends that "as a matter of law, plaintiff cannot establish that he has a right to speak Russian while a[t] work." (Defendant's Memorandum of Law, at 10.) It is clear that other courts have concluded that "[t]here is nothing in Title VII which protects or provides that an employee has a right to speak his or her native tongue while on the job." *Long v. First Union Corp. of Virginia*, 894 F. Supp. 933, 941 (E.D. Va. 1995) (internal citations omitted), *aff'd*, 86 F.3d 1151 (4th Cir. 1996); *accord Gonzalo v. All Island Transportation*, 04 Civ. 3452 (BMC), 2007 WL 642959 (E.D.N.Y. Feb. 26, 2007); *see also Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) ("Language, by itself, does not identify members of a suspect class."); *Velasquez v. Goldwater Memorial Hospital*, 88 F. Supp. 2d 257, 262 (S.D.N.Y. 2000) (noting that "[c]lassification on the basis of language does not by itself 'identify members of a suspect class' and would not support an inference of intentional national origin discrimination"). However, these cases address whether an employee has a right to conduct *business* conversations in his native language. In the instant case, plaintiff has set forth evidence that he was not permitted to conduct *personal* conversations over the telephone in his native language with his family members during non-working hours, and that other non-Russian employees were allowed to do so, including employees who spoke Spanish. (Compl. ¶ 40; Levitant 7/5/06 Dep. at 104-06.) For example, with respect to this policy, plaintiff testified: "It was said several times. One day she [i.e., Ms. Daniel-Preudhomme] said it before the new year. I think it was in 2003 when I was transferred to the new location to home care. She told me she heard me answering my cell phone. I had a family call during my lunch hour to my cell phone. She told me if she heard me again talking Russian on the phone she'll have the security remove me and throw me out." (Levitant 7/5/06 Dep. at 105.) On the same issue, plaintiff testified to the following policy directed towards him: "From Bridgette Simone she wrote in the letter that I cannot speak Russian, that I cannot speak any other language, only English despite the fact that Spanish speaking people including, but not limited to the ex-Deputy Director, Janet Lugar, she was Deputy Director in the place where I worked. She spoke with her subordinates in Spanish. She spoke with her family during the working hours in Spanish." (*Id.* at 106.) With respect to a particular document, plaintiff testified: "She told me I cannot use my telephone at my desk however the co-workers were allowed to use their phone, the Spanish speaking people were not calling not only the Deputy Director, the person sitting there Bulvar Espino was calling to his family

_____

rational jury could conclude that the comment was referencing his national origin and/or race based on plaintiff's testimony.

and talking during the working hours in Spanish." (*Id.*)

If such a policy by defendant were found to exist that specifically targeted plaintiff and his native language with respect to personal conversations, such evidence could be used to support the existence of a hostile work environment based upon his national origin. *See, e.g., Velasquez*, 88 F. Supp. 2d at 263 (stating that "if plaintiff were able to present evidence that other employees were permitted to speak in, for example, Chinese or Portugese, but not Spanish, such evidence could support an inference of intentional discrimination on the basis of national origin"); *accord EEOC v. Sephora USA, LLC*, No. 03 Civ. 8821, 2005 U.S. Dist. LEXIS 20014 (S.D.N.Y. Sept. 13, 2005); *EEOC v. Beauty Enters.*, 2005 U.S. Dist. LEXIS 25869 (D. Conn. 2005).

In addition to the above-referenced evidence, plaintiff also offers evidence that he was subjected to excessive monitoring by his supervisor. For example, plaintiff testified as follows: "I was monitored to the bathroom, her [i.e., Ms. Anderson] to watch me all the time, was not given a break. Nobody like I was given so much unreasonable attention. It was persistent activity around me all the time." (Levitant 6/28/06 Dep. at 273-74.) Although defendant argues that the Court should not consider this evidence because it is not an "adverse employment action," (Defendant's Memorandum of Law, at 13 n.9), the Court disagrees. The Court recognizes that, in general, "[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences." *Scafidi v. Baldwin Union Free School Dist.*, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003); *accord Fleming v. Verizon New York Inc.,* No. 03 Civ. 5639 (WHP), 2006 WL 2709766, at *11 (S.D.N.Y. Sept. 22, 2006); *see also Lester v. Natsios,* 290 F. Supp.2d 11, 30 (D.D.C. 2003) ("being closely supervised or 'watched' does not constitute an adverse employment action that can support a claim under Title VII") (collecting cases). *Castro v. New York City Bd. of Educ. Personnel*, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) (stating that "although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions"). However, although excessive scrutiny without any consequences is not an adverse employment action for purposes of a discrimination claim, it does not necessarily follow that such evidence cannot be considered by a jury in conjunction with other evidence with respect to a hostile work environment claim. In other words, in the instant case, plaintiff is not contending that the excessive scrutiny alone was an adverse employment action that can form the basis for a stand-alone claim of discrimination; rather, the contention is that it is part of a broader campaign of harassment and retaliation, which included, among other things, epithets and a policy of not allowing plaintiff to conduct personal telephone calls in Russian. Under such circumstances, the evidence of excessive monitoring can be considered in determining whether the overall work environment, if proven, was sufficient to constitute a hostile work environment. *See, e.g., Strickland v. United Parcel Service Co.,* No. 04 Civ. 01395 (RPM), 2006 WL 1102730, at *4 (D. Colo. Apr. 26, 2006) ("A hostile work environment claim may be established by evidence showing that an employee was subjected to excessive supervision or monitoring due to gender hostility."); *see also Johnson v. New York City Board of Education,* No. 96 Civ. 4472 (NGG), 2000 WL 1739308, at *6 (E.D.N.Y. Oct. 10, 2000) ("Plaintiff complains of micromanagement and

excessive scrutiny of her performance and teaching style. She also alleges that her supervisors' conclusions from their observations were unfounded and hypercritical. As a result, she suffered stress and stress-related health problems. A rational factfinder could conclude that Plaintiff's work environment was so intolerable or hostile as to affect her working terms and conditions or cause her to quit involuntarily.")

After carefully reviewing the entire record in this case, the Court concludes that plaintiff has raised genuine issues of material fact regarding whether the alleged discriminatory conduct by defendant rises to the severe level required to support a claim of hostile work environment. Though the alleged excessive monitoring and the alleged insults referring to plaintiff's racial and/or national origin (if credited) might not be sufficiently pervasive or severe to constitute a hostile work environment if viewed in isolation, there is also evidence that plaintiff was given a directive forbidding him from speaking his native language in personal conversations while others were permitted to do so. When the evidence is viewed together in its entirety, drawing all reasonable inferences in plaintiff's favor, a rational jury could conclude that defendant's discriminatory behavior was continuous and pervasive enough to create a hostile work environment in violation of Title VII. Accordingly, defendant's motion for summary judgment on this claim must be denied.

C. "Failure to Promote" Claim

Plaintiff brings claim that defendant discriminated against him in the terms and conditions of his employment based on his race and national origin in violation of Title VII. Specifically, plaintiff asserts that in March of 2004, Agency supervisors failed to promote him to a Supervisor I position because he was of Caucasian race and Russian national origin. Defendant argues this discrimination claim fails as a matter of law because the undisputed facts demonstrate that he was not promoted for legitimate, non-discriminatory reasons. For the reasons set forth below, the Court finds that the plaintiff has presented a genuine issue of material fact on this issue, and, thus, defendant's motion for summary judgment on this claim is denied.

1. Legal Standard

Because plaintiff presents no direct evidence of discriminatory treatment based on his race, the Court reviews his claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). With respect to a discriminatory failure to hire or promote claim, the *McDonnell Douglas* test applies. Thus, plaintiff can establish a *prima facie* case of unlawful discrimination by showing that: (1) he is a member of a protected category; (2) he applied for an available position; (3) he was qualified for the position; and (4) he was rejected under circumstances that give rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). Moreover, "[a]n inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [] or if the position was filled by someone not a member of plaintiff's protected class." *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason'" for the failure to promote plaintiff. *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

## 2. Application

The Court concludes that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. In response, defendant has established a legitimate non-discriminatory reason for defendant's failure to promote plaintiff to a Supervisor I position, namely, the pending disciplinary charges lodged against plaintiff at the time of his interview. Specifically, defendant argues that there was a policy that "individuals who have pending disciplinary charges will not be selected for promotion until those charges have been adjudicated." (Defendant's Memorandum of Law, at 6.) Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find race discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y. 1999), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley v. Columbia Univ. – Coll. of Physicians & Surgeons*, 999 F. Supp. 506, 515 (S.D.N.Y. 1998).

In support of its position that plaintiff was not promoted to a Supervisor I position for a legitimate, non-discriminatory reason, defendant directs the Court to the declaration of Judith Loewenstein, Deputy Director of the Agency's Recruitment, Selection and Placement Division. Ms. Loewenstein states therein that individuals who have pending disciplinary charges will not be selected for promotion until those charges have been adjudicated. (Def.'s Ex. 7.) According to defendant, on March 24, 2004, the date of plaintiff's interview, plaintiff had pending disciplinary charges and, thus, was not promoted. (Def.'s Exs. NN, AAA, HHH.) Defendant further notes that of the fifty-three candidates eligible for promotion to the Supervisor I position at that time, thirty-five identified as African-American, six identified as Caucasian, six identified as Asian-American, two identified as Hispanic and two did not identify themselves by race. (Def.'s Ex. 10.) Of the twelve individuals who were selected for promotion to the Supervisor I position at that time, eight identified as African-American, two identified as Asian-American, two identified as Hispanic and one identified as Caucasian. (*Id.*)

Plaintiff does not dispute that, at the time of his interview for the Supervisor I position, he had disciplinary charges pending. In support of his position that the issue of pending disciplinary charges was merely a pretextual one to disguise animus based on plaintiff's race and national origin, he alleges that the individual promoted to the Supervisor I position for which he interviewed was a lesser-qualified African-American individual who also had pending disciplinary charges. (Plaintiff's Memorandum of Law, at 8.) In particular, plaintiff points to the March 13, 2007 testimony of Director Eileen Anderson of the Brooklyn APS, who was plaintiff's supervisor, in which she testified that Moryam A. Ladotun was hired and promoted to position of Supervisor I, even though her position number of 646 was lower than that of plaintiff (who was at number 478) and Ms. Ladotun may have had disciplinary

charges pending against her. (Anderson Tr. at 1190-93.)[8]

Given the record in this case, the Court concludes that there are genuine issues of material fact on the "failure to promote" claim that precludes summary judgment. It

<hr/>

[8] In the letter to the Court dated December 16, 2008, defendant notes that Ms. Ladotun also was initially passed over for the promotion. (Anderson Tr. at 1108-09.) However, it is undisputed that Ms. Ladotun later received the promotion, while plaintiff did not. (*See* Anderson Tr. at 1190 ("Q. For instance, Ms. Ladotun below Mr. Levitant got the promotion, didn't she? A. Yes.").) Therefore, the fact that Ms. Ladotun did not initially receive the promotion does not defeat plaintiff's failure to promote claim. Similarly, although defendant contends that there is no evidence that Ms. Ladotun had pending disciplinary charges at the time of the promotion, plaintiff disputes that fact and the record on that issue is far from clear. Specifically, when asked about disciplinary charges pending against Ms. Ladotun, Ms. Anderson answered: "I know Ms. Ladotun had disciplinary charges pending. What dates, when and where, I don't know." (Anderson Tr. at 1193.) Although this testimony is somewhat ambiguous, it could be interpreted, if viewed in the light most favorable to plaintiff, as an acknowledgment that, although Anderson was not aware of the precise date or nature of the disciplinary charge against Ms. Ladotun, it was pending at the time of the promotion decision. Defendant has submitted no documentation regarding when Ms. Ladotun disciplinary charges were resolved and, thus, this remains a disputed factual issue. The defendant's citation to the Lowenstein Declaration is inapposite because Ms. Lowenstein simply stated that it is defendant's policy not to promote employees with pending disciplinary charges, but provides no specific information regarding Ms. Ladotun's situation. Therefore, as discussed below, Ms. Anderson's ambiguous testimony is sufficient to create an issue of material fact regarding the promotion that needs to be resolved at trial.

is well-settled that a plaintiff can raise an inference of discrimination by showing disparate treatment – namely, that a similarly situated employee outside the protected group received more favorable treatment. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all *material* respects. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee."); *accord Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). The Second Circuit has further defined what the term "all material respects" means in this context:

> What constitutes "all material respects". . . varies somewhat from case to case and, as we recognized in *Norville,* must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical . . . . The determination that two acts are of comparable seriousness requires – in addition to an examination of the acts – an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citations and quotations omitted). Under these circumstances, the Court cannot conclude that no reasonable jury could find the similarly situated requirement was met in this case with respect to Ms. Ladotun based on the current record. *See Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (same).

In short, if all of plaintiff's evidence is credited, including evidence that an employee of another race and national origin with less experience and pending disciplinary charges was promoted, the Court concludes that a reasonable jury could infer pretextual discrimination in connection with defendant's decision not to promote plaintiff. Therefore, defendant's motion for summary judgment on plaintiff's failure to promote claim is denied.

### C. Retaliation

Finally, plaintiff brings claim that defendant supervisors subjected him to a hostile work environment, as well as various discrete adverse employment actions in retaliation for his participation in protected activity, namely, for filing complaints about discrimination. Defendant argues that summary judgment is appropriate because "[p]laintiff fails to demonstrate that he suffered retaliatory actions and that there was a causal connection between the alleged acts and his filings." (Defendant's Memorandum of Law, at 12.) As set forth below, the Court concludes that there are genuine issues of material fact on the retaliation claim that precludes summary judgment.

### 1. Legal Standard

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).

The Court evaluates a Title VII retaliation claim under the same three-step, burden-shifting framework used for an adverse employment claim, as established by the *McDonnell Douglas* case. First, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action and if he carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. *See Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

### 2. Application

Here, plaintiff alleges that he was the victim of a series of adverse actions perpetrated by defendant supervisors in retaliation for complaints he lodged about them. Specifically, he alleges that: (1) in early to mid-2002, supervisor Kennedy retaliated against him by speaking of his national origin and religious affiliation in a disparaging manner; (2) supervisor Anderson assaulted him on June 25, 2002 in retaliation for filing three grievances prior to that date regarding racially discriminatory treatment and proceeded to unreasonably monitor him thereafter; (3) supervisor Anderson created a hostile work environment in August of 2003 in retaliation for previous complaints he had filed regarding unsanitary work conditions and racial discrimination; (4) on August 8, 2003, supervisor Brown threatened to file disciplinary charges against plaintiff for complaints he had filed alleging discriminatory treatment; (5) for a period of time beginning in September of 2003, defendant supervisors filed various disciplinary charges against him in retaliation for complaints he filed against them; (6) during that same time period, plaintiff was suspended without pay and deprived of medical benefits in retaliation for complaints filed; (7) in December of 2003, supervisor Anderson refused to transfer him back to the Brooklyn APS unit in retaliation for an EEO complaint that he filed about her; and (8) in March of 2004, supervisors Brown and Anderson conspired to derail his potential promotion to the Supervisor I level in retaliation for complaints he filed about their discriminatory treatment of him.[9]

Defendant correctly notes that plaintiff filed his first internal complaint in August of 2002 (which alleged only unfavorable

_____

[9] The Court notes that plaintiff further alleged in his opposition to the instant motion that defendant also retaliated against him by denying him sick time and travel costs. (Plaintiff's Memorandum of Law, at 4.)

working conditions, and not discrimination), two months *after* the first two alleged retaliatory actions took place. Therefore, the alleged actions of defendants prior to August of 2002 could not have been perpetrated in retaliation for plaintiff's complaints, as none had yet been filed.[10] *See, e.g. Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding no evidence of retaliation where the alleged adverse work action occurred prior to the filing of plaintiff's EEOC complaint); *Rothenberger v. New York City Police Dep't*, 06 Civ. 868 (NGG), 2008 WL 2435563 (E.D.N.Y. June 16, 2008) (ruling that plaintiff's EEOC complaint was not causally connected to adverse work action taken prior to the filing of the complaint); *Pinero v. Long Island Veterans State Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity."). Accordingly, alleged actions taken by his supervisors in 2002 cannot provide a basis for retaliation under the *McDonnell Douglas* test.

Defendant further notes that, although plaintiff filed a series of complaints between 2002 and 2004 with both the Union and the EEO, he did not report any incidents of race-based discrimination until February 20, 2004, in the complaint he filed with the EEOC. Prior to filing his EEOC complaint, plaintiff filed two EEO complaints, one Agency internal complaint, one verified improper practice petition and three union grievances alleging mistreatment and retaliation by defendant supervisors *on account of his union activities*. The internal complaint that he filed on August 12, 2003 did allege that supervisor Anderson retaliated against him for filing a previous claim of racial discrimination, a claim which he had never actually filed.

The Court must determine, then, as a threshold matter, whether the aforementioned complaints that plaintiff filed constitute "protected activity" under Title VII, which protects an employee's opposition to "any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Title VII does not provide redress for employees alleging discrimination based on their participation in union activities.[11] *Mitchell v. Superior Court*, 04 Civ. 3301, 2007 U.S. Dist. LEXIS 41464, at *48-49 (N.D. Cal. June 7, 2007) ("[plaintiff's] claims of retaliation based on union activity are not within the purview of Title VII, whose scope is specifically delineated in the statute and is the subject of an extensive jurisprudence"); *Brown v. City of Cleveland*, 05 Civ. 2974, 2007 U.S. Dist. LEXIS 20826, at *25 (N.D. Ohio Mar. 22, 2007) (filing of claim alleging racial and gender discrimination constituted "protected activity" under Title VII, while claim alleging discrimination based on union activity did not); *Carrion v. Local 32B-32J Service Employees International Union, AFL-CIO*, No. 03 Civ. 1896 (THK), 2005 WL 659321, at *53-54 (S.D.N.Y. Mar. 21, 2005) (plaintiff's participation in union activity not a "protected activity"); *Drake v. Delta Airlines*, 94 Civ. 5944, 1997 U.S. Dist. LEXIS 22753, at *5-6 (E.D.N.Y. Jul. 10, 1997) (stating that "[plaintiff] cannot bring a claim for relief under Title VII since that legislation does not prohibit employment

---

[10] The Court further notes that plaintiff's allegation that supervisor Anderson assaulted him on June 25, 2002 in retaliation for filing previous grievances against her is also time-barred as a discrete employment act not implicated by the "continuing violation" doctrine, as discussed *supra*.

[11] Retaliation against employees for their union activities does constitute a violation of the First Amendment, *see Clue v. Johnson*, 179 F. 3d 57, 60 (2d Cir. 1999), but plaintiff has not brought such a claim in this action.

discrimination on the basis of anti-union sentiment"); *Lee v. U.S. Postal Serv.*, 882 F. Supp. 589, 597 (E.D. Tex. 1995) ("Title VII does not protect union activities; such activities are covered by other provisions of federal law."); *see also Cobb v. Potter*, 2006 U.S. Dist. LEXIS 63118 (W.D.N.C. Aug. 22, 2006); *Stotler v. Potter*, 2006 U.S. Dist. LEXIS 19801 (D. Neb. Apr. 10, 2006); *Ramirez v. Gonzales*, 2006 U.S. Dist. LEXIS 9473 (S.D. Tex. Feb. 23, 2006); *Onofrei v. Gen. Sec. Servs. Corp.*, 2005 U.S. Dist. LEXIS 32716 (N.D. Ill. Dec. 5, 2005).

Therefore, plaintiff's filing of complaints alleging retaliation for participation in union activities does not constitute a "protected activity" under Title VII. However, although plaintiff never actually filed the claim of racial discrimination referenced in his August 12, 2003 internal complaint, the fact remains that in filing a complaint addressing it, he opposed a practice – retaliation for lodging a complaint of racial discrimination – made unlawful by Title VII. *See Goldschmidt v. New York State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 318-19 (S.D.N.Y. 2005) ("All too often . . . employers react negatively to the assertion of a claim and consequently turn a weak discrimination case into a strong retaliation case."); *Alvarez v. City of New York*, 31 F. Supp. 2d 334, 344 (S.D.N.Y. 1998); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 762 (2d Cir. 1998). Therefore, the filing of the August 12, 2003 EEO complaint constitutes "protected activity." The same holds true for the EEOC complaints that plaintiff filed on February 20, 2004 and July 13, 2004, both of which alleged discrimination on the basis of race and national origin. Accordingly, the Court will review whether a reasonable jury could conclude, based on the evidence submitted by plaintiff and drawing favorable inferences therefrom, that the alleged actions taken against plaintiff after August 12, 2003 were taken in retaliation for his protected activity.

As defendant does not dispute that the supervisors in question were aware of plaintiff's protected activity and that he suffered adverse employment actions, the Court will examine whether a reasonable jury could conclude that the two were causally related. A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (holding that a causal connection may be "established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus"). Where there is no direct evidence of retaliatory animus or a showing of disparate treatment of fellow employees who engaged in the same conduct, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action. *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Cifra v. GE*, 252 F.3d 205, 217 (2d Cir. 1991) ("[T]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal citation omitted)). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action[,]" *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), some district courts have generally concluded that "a passage of two months between the

protected activity and the adverse employment action seems to be the dividing line." *Cunningham v. Consol. Edison, Inc.*, No. 03 Civ. 3522, 2006 U.S. Dist. LEXIS 22482, at *55-56 (E.D.N.Y. Mar. 28, 2006) (collecting cases). However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g., Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier).

Plaintiff alleges that soon after his September 2003 leave of absence, defendant supervisors lodged disciplinary charges against him and suspended him without pay in retaliation for complaints he had filed against them. He further alleges that supervisor Anderson refused to transfer him back to the Brooklyn APS unit in December of 2003 in retaliation for the EEO complaint he filed about her and that she conspired with supervisor Brown in March of 2004 to derail his potential promotion, also in retaliation for the complaint. Plaintiff presents no direct evidence of retaliatory animus, but rather argues that the temporal relationship between the protected activity and the adverse action suggests a causal connection. Plaintiff notes that he was charged with disciplinary infractions approximately three months after he filed his August 12, 2003 EEO complaint. He also points to evidence that he was ordered not to speak his native language in the workplace in November and December of 2003, some three and four months after that complaint was lodged, respectively. Further,

within approximately one month of the filing of his February 20, 2004 EEOC complaint, plaintiff was passed over for promotion after an interview conducted by one supervisor he had specified by name in an earlier allegation of racial discrimination. Although defendant argues that plaintiff's combative demeanor warranted the disciplinary actions taken against him, there are numerous disputed issues of fact concerning the validity of these disciplinary charges, and plaintiff notes that a majority of the charges were dismissed in administrative proceedings. In short, the temporal proximity of the alleged retaliatory acts, coupled with plaintiff's other circumstantial evidence – including, among other things, plaintiff's disputed evidence that many of the actions taken against him were without factual basis and his allegation regarding the policy in late 2003 of not allowing him to speak in Russian – are sufficient under the circumstances of this case to raise issues of material fact that preclude summary judgment on the retaliation claim. *See, e.g., Erbel v. Johanns,* No. 3:04 Civ. 555 (TWP), 2007 WL 1387331, at *15 (E.D. Tenn. May 8, 2007) ("While the Court finds that the temporal proximity showing in the instant matter is strong, the Court also considers the evidence of plaintiff's satisfactory work history, the facts that plaintiff was subjected to excessive scrutiny and disciplined for trivial matters, i.e. treated differently from other employees who did not engage in protected activity. This evidence is sufficient to support a prima facie case and also sufficient to evince pretext. Accordingly, summary judgment for the retaliation claim for participating in protected activities is not appropriate."). Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the Court cannot rule as a matter of law that no reasonable jury could infer that the defendant's actions were motivated by retaliatory animus based upon plaintiff's

protected activity under Title VII. Accordingly, defendant's motion for summary judgment on plaintiff's retaliation claim for adverse actions taken by defendant after August 12, 2003 is denied.

### V. CONCLUSION

For the foregoing reasons, the Court denies defendant's motion for summary judgment in its entirety.


SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge


Dated:          December 18, 2008
                Central Islip, NY

* * *

The attorney for plaintiff is Susan Roth, 26 Court Street, Suite 512, Brooklyn, NY, 11242. The attorneys for defendant are Amy Grossberg and Carolyn Walker-Diallo, New York City Law Department, 100 Church Street, Room 2-138, New York, NY, 10007.