UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------- X
ZINOVY LEVITANT,

          Plaintiff,               **<u>MEMORANDUM & ORDER</u>**

  -against-                 05-CV-230 (KAM)

THE CITY OF NEW YORK HUMAN
RESOURCES ADMINISTRATION,

          Defendant.
--------------------------------- X

**MATSUMOTO, United States District Judge:**

        On April 30, 2012, a jury returned a verdict in favor of plaintiff Zinoviy Levitant ("plaintiff") on a retaliation claim against his former employer, the City of New York Human Resources Administration ("defendant" or "NYCHRA"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII"), awarding plaintiff $250,000 in compensatory damages. The jury found in favor of defendant on plaintiff's hostile work environment and failure to promote claims. Presently before the court are defendant's motions for judgment as a matter of law under Federal Rule of Civil Procedure 50 ("Rule 50"), or alternatively, for a new trial or a conditional order of remittitur under Federal Rule of Civil Procedure 59 ("Rule 59").

        Under our system of jury trials, a jury's verdict has always been accorded great deference, and the court is cognizant of the extraordinary circumstances that must exist to overturn a

jury's determination. Having carefully reviewed the trial
record in the light most favorable to the plaintiff, the parties'
submissions, and the relevant case law, for the reasons set
forth below, the court grants defendant's motion for judgment as
a matter of law, and directs entry of judgment in defendant's
favor.

## BACKGROUND[1]

### I.   History of the Case

On January 14, 2005, plaintiff commenced this
employment discrimination action against defendant pursuant to
Title VII alleging: (1) that defendant discriminated against
plaintiff on the basis of his race and Russian national origin
by denying a transfer request, failing to promote him, and
subjecting him to a hostile work environment; and (2) that
defendant retaliated against plaintiff after he complained about
such discrimination. (*See* ECF No. 1, Complaint ("Compl.").) On
December 18, 2008, District Judge Bianco denied defendant's
motion for summary judgment, found that plaintiff's failure to
transfer claim was time-barred, and concluded that plaintiff's
filing of a complaint addressing racial discrimination on August
12, 2003 constituted the first instance of "protected activity"
for his retaliation claim under Title VII. *Levitant v. City of*

---

[1] Familiarity with the facts and prior opinions in this matter is
presumed and only the background relevant to this motion is set forth below.

*N.Y. Human Res. Admin.*, 625 F. Supp. 2d 85, 95-97, 107 (E.D.N.Y. 2008). Additionally, Judge Bianco found that plaintiff engaged in protected activity by filing subsequent complaints alleging race and national origin discrimination on February 20, 2004 and July 13, 2004. *Id.* at 107. After the case was transferred to the undersigned on February 28, 2011, the court ruled on various motions *in limine* by defendant. *See Levitant v. City of N.Y. Human Res. Admin.*, No. 05-CV-230, 2011 U.S. Dist. LEXIS 20742 (E.D.N.Y. Feb. 28, 2011).

After several adjournments of trial requested by plaintiff, jury selection and trial began on April 23, 2012 and lasted five days. On April 30, 2012, the jury returned a verdict in favor of defendant on plaintiff's failure to promote and hostile work environment claims based on race and national origin discrimination, and in favor of plaintiff on the retaliation claim. (*See* ECF No. 142, Jury Verdict.) Specifically, the jury found that the defendant subjected the plaintiff to a materially adverse employment action after August 12, 2003 in retaliation for engaging in protected activity, and awarded $250,000 in compensatory damages as proximately caused by the defendant's retaliatory conduct. (*Id.*)

## II.  The Evidence at Trial

Because the motions at issue are only relevant to plaintiff's retaliation claim, which must be predicated on

defendant's conduct on or after plaintiff's complaint of discrimination on August 12, 2003, the court will primarily focus on evidence relating to events after August 12, 2003, providing background information where appropriate. In summarizing the evidence, the court is mindful that, for the purpose of a Rule 50 motion for judgment as a matter of law, the "court must consider the evidence in the light most favorable to the [plaintiff] and give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (internal quotation marks omitted); *accord Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

## A.    Plaintiff's Case

Plaintiff's retaliation claim is based solely on his own testimony at trial; he presented no documentary evidence in support of his claims except for his discrimination complaints dated February 20, 2004, and July 13, 2004 (Plaintiff's Exs. ("PX")-4, PX-5) and their accompanying exhibits, and a certificate of achievement for completing supervisor training dated February 23, 2004 (PX-8). Although plaintiff presented the testimony of another witness, Sybil Alexander, and the deposition testimony of an unavailable witness, Chibuzoh Enwereuzoh, the testimony of these witnesses related only to events prior to plaintiff's August 12, 2003 discrimination

complaint, the date of the first instance of protected activity
by plaintiff.  The court will therefore summarize plaintiff's
testimony.

       *1.   Plaintiff's Background*

Plaintiff was born in 1954 in the Ukraine, then a part
of the Soviet Union.  (Trial Transcript ("Tr.") 24.)  In
November 1991, plaintiff came to the United States as a refugee
based on persecution of Russian Jews in the Ukraine.  (Tr. 25.)
After engaging in other employment in the United States,
plaintiff began working for the City of New York (the "City") as
a caseworker in the Administration for Child Services ("ACS").
(Tr. 27, 32.)  Plaintiff had a good relationship with his
supervisors at ACS and he did not have any disciplinary charges
pending at the time of his departure from ACS.  (Tr. 29-30, 38.)

       *2.   Plaintiff's Employment at Brooklyn Adult
           Protective Services Between December 2000 and
           August 2003*

In early December 2000, plaintiff was transferred from
ACS to the NYCHRA to work in the Assessment Unit of the
department of Adult Protective Services in Brooklyn, New York
("Brooklyn APS"), which was located at 103 Clinton Street in
Brooklyn.  (Tr. 38, 40, 308.)  In the Assessment Unit, plaintiff
assessed the needs of at-risk individuals over the age of
eighteen in response to reports received by the NYCHRA, and
provided referrals for, *inter alia*, medical assistance, house

cleaning, transportation, and disability insurance where necessary. (Tr. 39.)

In the beginning of 2001, plaintiff was transferred from the Assessment Unit of Brooklyn APS to the Under Care Unit, which provides visits to clients once a month after the above-referenced services by the Assessment Unit have been put into place. (Tr. 39-40, 45.) The Under Care Unit was located at the same office at 103 Clinton Street in Brooklyn, but the office moved to 250 Livingston Street in Brooklyn prior to August 2003. (Tr. 45, 316.) During the beginning of his work in the Under Care Unit until at least April 2001, plaintiff was supervised directly by Martin Agwuncha, a Supervisor I,[2] who in turn reported to Deborah Holt-Knight, then the deputy director of Brooklyn APS. (Tr. 517, 527-29; see Defendant's Exhibit ("DX")-B.) At some point after April 2001 until his departure from Brooklyn APS on August 8, 2003, plaintiff was directly supervised by Martha Barnes, a Supervisor I, who in turn reported to Dr. Urdine Kennedy, a Supervisor III, and Sandra Brown, a Supervisor III and then-deputy director of Brooklyn APS. (Tr. 45, 47, 550.) Finally, Eileen Anderson was the overall director of Brooklyn APS at all relevant times. (Tr. 40, 47, 377.)

---

[2] The Roman numerals indicate the level of the supervisor, with higher numbers indicating a higher-level supervisor.

Plaintiff testified regarding specific incidents involving his supervisors at Brooklyn APS that were the subject of his Title VII claims based on race and/or national origin discrimination, for which the jury found in favor of the defendant. The court will briefly summarize these incidents because they provide context for plaintiff's retaliation claim:

- At some point prior to June 25, 2002, Dr. Kennedy told plaintiff to "[g]o and drink water from the toilet. You Russians did that in the past." (Tr. 51.)

- On June 25, 2002, when plaintiff was trying to obtain Dr. Kennedy's signature on a field visit slip, Ms. Anderson "grabbed" plaintiff with both her hands and "pushed" him into Dr. Kennedy's office. When Ms. Anderson then proceeded to physically block plaintiff's exit from the office, plaintiff "screamed for help" and Ms. Anderson stopped blocking the exit. (Tr. 48-49.)

- On August 8, 2003, in connection with plaintiff's questioning of a client regarding her medication in the Brooklyn APS office, Ms. Barnes approached plaintiff when she "was very upset and hostile," got close to plaintiff's face, and mocked plaintiff's Russian accent. When plaintiff told Ms. Barnes that her conduct was "totally inappropriate" and that he was going to file a complaint against her, Ms. Barnes "stuck her fingers in [plaintiff's] face" and continued to mock his accent. (Tr. 80-82, 239-42, 246, 295-97.)

- Immediately after the August 8, 2003 incident with Ms. Barnes, plaintiff asked a union delegate, Sybil Alexander, to accompany him to the office of Ms. Brown to discuss the incident. Ms. Brown reacted by telling Ms. Alexander to leave her office immediately and slamming the door to her office in Ms. Alexander's face. Ms. Brown then came close to the plaintiff and told him that he could "consider himself fired, because I'm filing charges against you." When

plaintiff told her that he was going to "take action" due to Ms. Brown's assault of him and Ms. Alexander, Ms. Brown said that plaintiff had "just made a verbal threat" to her and that "the police will be here in five minutes." Upon hearing that the police were called, plaintiff left the office immediately. (Tr. 84-86, 246, 318.)

Plaintiff did not return to Brooklyn APS after he left the office on August 8, 2003.

On August 12, 2003, in response to the incident with Ms. Barnes and Ms. Brown, plaintiff filed an internal complaint of discrimination with defendant's Office of Equal Employment Opportunity ("EEO"), naming Ms. Anderson as the person who discriminated against him and stating that "Ms. Anderson has turned against me." (Tr. 100-01; DX-BB (the August 12, 2003 EEO complaint).) This was the first complaint that plaintiff filed raising race and national origin discrimination. (*See* Tr. 200.)

### 3. *Plaintiff's Reassignment to Lombardi Home Care*

After the August 8, 2003 incident, plaintiff was on a medical leave of absence for approximately two months and then took four weeks of annual leave vacation that he had previously scheduled. (Tr. 88-90, 256-58, 495.) Plaintiff testified that at an unspecified time while plaintiff was on medical leave and/or vacation, plaintiff was informed that he was suspended for charges "stemming from the beginning of June 25, 2002 up to 2003." (Tr. 93.) Plaintiff presented no other evidence regarding this suspension.

After his medical leave and vacation, plaintiff returned to work and spent one week waiting for an assignment at defendant's personnel office for medical assistance programs ("Personnel"). (Tr. 257-59.) During that week at Personnel, plaintiff had to sit in a "very small space" without any assignment from 9:00 AM to 5:00 PM and was "monitored by [a] security guard." (Tr. 95.) Plaintiff testified that Richard Marin, the first assistant to the executive deputy commissioner, and Chuck Waxman, the director of Personnel, told him that he would not be returning to Brooklyn APS because "Ms. Anderson and Ms. Brown are afraid to see [him]." (Tr. 94, 260-61.) On cross-examination, plaintiff testified that he "did not insist" on being returned to Brooklyn APS in a conversation with Mr. Marin. (Tr. 260-61.)

### 4. Plaintiff's Employment at Lombardi Between November 2003 and September 2005

After the week at Personnel, plaintiff was assigned to the Lombardi Program, also known as the Long-Term Home Health Care program ("Lombardi"), where he began work as a case manager on November 3, 2003. (Tr. 95, 261-62; DX-KK at D0257 (memorandum dated December 3, 2003 stating that defendant began work at Lombardi on November 3, 2003).)

Lombardi provides nursing and medical services for sick and elderly individuals who are qualified to enter a

nursing home, but prefer to remain in their homes.  (Tr. 95-96.)
Plaintiff first began working at the Lombardi office located at
109 East 16th Street in Manhattan, but was transferred after
several weeks to an office located at 309 East 94th Street,
which was "very far" from his residence in Brooklyn.  (Tr. 98.)

At Lombardi, plaintiff testified that he was "doing
[a] supervisor job in the title of [a] caseworker and for the
salary of [a] caseworker for two years."[3]  (Tr. 95; *see also* Tr.
301 (plaintiff testifying that it was a "job requirement" that
one "have the title of Supervisor I or II" in order to work at
Lombardi).)  Plaintiff also testified that he was the only
caseworker among supervisors at Lombardi and that he "had to do
the same job as those supervisors."  (Tr. 95.)  Specifically,
plaintiff testified that he approved budget requests for home
care services to be provided to clients by home care agencies,
and that he had to sign his name as a supervisor.  (Tr. 95-97.)
Plaintiff was supervised at Lombardi by Janet Lugo, the
executive director of Lombardi, and Debora Daniel-Preudhomme
("Ms. Preudhomme"), the overall director of the Lombardi office
at East 94th Street.  (Tr. 96-97.)

---

[3]  During the cross-examination of Ms. Holt-Knight, plaintiff
elicited testimony that a supervisor's salary at APS "could be 3,000 or more"
than the salary of a caseworker.  (Tr. 533-34.)  There was no evidence
presented regarding the difference between a supervisor's salary and a
caseworker's salary at Lombardi.

At an unspecified time when plaintiff was at Lombardi, plaintiff took a personal call from his family during his lunch break and spoke Russian. (Tr. 98.) Plaintiff testified that Ms. Preudhomme told him that she did not want to hear him speak Russian in the office, even during personal calls on his lunch hour, and that she threatened plaintiff several times that she would call security and have plaintiff thrown out of the office if he spoke Russian again. (Tr. 98, 261-62.)[4] Plaintiff did not observe Ms. Preudhomme make the same comments to employees that spoke other languages, including several Spanish-speaking employees, and plaintiff testified that he heard Spanish spoken in the office "all the time," including during personal phone calls. (Tr. 99-100.)

On February 20, 2004, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging national origin discrimination and retaliation, and stating, *inter alia*, that Ms. Preudhomme instructed him not to speak Russian in the office. (Plaintiff's Exhibit ("PX")-4.) Finally, plaintiff summarily characterized his relationship with

---

[4] Plaintiff initially testified during direct examination that it was Ms. Barnes who told him that he could not speak Russian in the Lombardi office, but Ms. Barnes only interacted with plaintiff when he was at Brooklyn APS, not at Lombardi. (Tr. 98.) On cross-examination, plaintiff testified that it was Ms. Preudhomme who told him not to speak Russian in the Lombardi office. (Tr. 262.) This is just one of several occasions in which plaintiff appeared to confuse events that occurred at Brooklyn APS with events that occurred at Lombardi. As all inferences must be drawn in plaintiff's favor, the court will assume that plaintiff mistakenly referenced Ms. Barnes in relation to the Lombardi location during direct examination when he in fact meant Ms. Preudhomme.

Ms. Preudhomme after March 2004 as one of "hostility and
aggression and addressing for contempt [sic] and following and
monitoring and threatening." (Tr. 123.)

> 5. *The Failure to Promote Plaintiff to Supervisor I*
>    *in March 2004*

At an unspecified point in time, plaintiff applied for
a Supervisor I position at Brooklyn APS. (Tr. 115-16, 269; *see*
Tr. 509-10.) In order to apply for this position, plaintiff
took a written test and was placed on a civil service list in
which he was assigned a number ranking based on his score on the
test (a "list number"), with the lowest list numbers assigned to
those with the highest scores on the test. (Tr. 116-118, 269.)
Based on his score on the written test, plaintiff was assigned
list number 478.5 and was selected to participate in an
interview of an open pool of candidates for Supervisor I
positions available at Brooklyn APS. (Tr. 116-18, 269-71; *see*
*also* Exhibit A to PX-5 (letter dated March 18, 2004 notifying
plaintiff of interview).)

On March 24, 2004, plaintiff was interviewed for a
Supervisor I position at Brooklyn APS by Ms. Anderson and Ms.
Brown, individuals against whom plaintiff previously filed
complaints of discrimination.[5] (Tr. 121.) At the interview, Ms.
Anderson did not look into plaintiff's eyes and Ms. Brown asked

---

[5] Plaintiff testified that he was also interviewed in March 2004
by Ms. Holt-Knight for a position at the APS office in Manhattan. (Tr. 545.)
Plaintiff did not present any evidence regarding that interview.

plaintiff "several routine questions." (Tr. 121-22.) Within

ten minutes of being interviewed and at the same location where

the interview took place, plaintiff was given a letter

indicating that he was not selected for the position and "was

told to get out immediately" by a person in charge of the

interviews. (Tr. 122; see also Exhibit B to PX-5 (Letter dated

March 24, 2012 informing plaintiff that he was "considered and

not selected for appointment or promotion").) On cross-

examination, plaintiff admitted that, of the five people who

were interviewed for the same Supervisor I position as plaintiff,

the two individuals with the lowest list numbers, specifically

list numbers 316 and 372, were ultimately selected for the

promotion to Supervisor I. (Tr. 275; see DX-TTT-2.)

On July 13, 2004, plaintiff filed a charge of

discrimination with the EEOC for national origin discrimination

in connection with the March 2004 denial of his promotion to

Supervisor I, in which he named Ms. Anderson and Ms. Brown. (Tr.

115; PX-5.)

On September 12, 2005, plaintiff stopped working at

Lombardi because he was physically incapable of coming to work

and requested a medical leave of absence. (Tr. 123-24.)

Thereafter, plaintiff never again worked for the defendant;

however, a discrimination claim regarding plaintiff's

termination is the subject of a subsequent lawsuit against defendant.  (Tr. 768.)[6]

### B.  Defendant's Case

The defense case consisted largely of testimony by plaintiff's supervisors at Brooklyn APS and Lombardi, and documentary evidence by supervisors and administrators of plaintiff's misconduct while working for the defendant and his resistance to supervision.  Although the court must view all the evidence in the light most favorable to the plaintiff in deciding defendant's Rule 50 motion and cannot weigh the evidence or substitute its credibility determinations for that of the jury, the court will summarize the testimony of the defense witnesses to provide context for the issues that were and were not in dispute at trial.

First, Ms. Anderson, the director of Brooklyn APS during all relevant times, testified that plaintiff was a "challenging worker" because he was "difficult to manage" and did "not take instructions very well from supervisors."  (Tr. 378.)  In 2001, Ms. Anderson received at least two memoranda from plaintiff's direct supervisors at Brooklyn APS regarding

---

[6]   In September 2008, plaintiff filed a second lawsuit against the defendant pursuant to the Americans with Disabilities Act and the Family and Medical Leave Act, alleging disability-based discrimination in connection with his termination (the "ADA/FMLA Lawsuit").  Although that second lawsuit is also before this court (*see Levitant v. City of N.Y. Human Res. Admin*, Case No. 08-CV-3979), its claims are distinct from the claims in this case and were not part of the trial at issue in this decision.  (*See* Tr. 765.)

plaintiff's inappropriate behavior and his resistance to
supervision, which caused her to consider requesting that he be
transferred back to ACS.  (Tr. 379-82; see DX-C, DX-D.)[7]

With respect to the June 25, 2002 incident in which
plaintiff testified that he was physically pushed into an office
by Ms. Anderson (Tr. 48-49), Ms. Anderson testified that she
"did not touch" the plaintiff (Tr. 478) and that she felt
threatened and intimidated by the plaintiff during that
interaction.  (Tr. 382-88; see also DX-H and DX-I (memoranda
written by Dr. Kennedy detailing the events on June 25, 2002
that Ms. Anderson testified were accurate)).  On June 26, 2002,
Ms. Anderson wrote a memorandum to Mr. Waxman, the director of
Personnel, requesting disciplinary action for plaintiff's
"intolerable" behavior on June 25, 2002, which consisted of
plaintiff breathing heavily on Ms. Anderson in an "intimidating
way" and pushing Ms. Anderson with his hands.  (Tr. 386; DX-J).
Finally, Ms. Anderson also testified that, after the August 8,
2003 incident between plaintiff and Ms. Barnes and Ms. Brown, Ms.

---

[7]  During plaintiff's cross-examination, defendant introduced
several documents from plaintiff's supervisors at Brooklyn APS and Lombardi
from between January 2001 and February 2004 concerning his resistance to
supervision, failure to perform certain required tasks, and various
disciplinary issues, but plaintiff denied receiving those documents, as well
as the truth of the statements contained therein. (See Tr. 137-69, 189-98,
213-16, 227-29, 260-68, 302-06; DX-B, DX-C, DX-D, DX-E, DX-G, DX-H, DX-K, DX-
L, DX-R, DX-S, DX-T, DX-HH, DX-II, DX-OO, DX-PP.)  Plaintiff did, however,
admit to receiving a memorandum dated December 3, 2003 from Ms. Preudhomme
instructing him to "cease and desist immediately all excess usage of the
telephone conducting personal or union business." (Tr. 264; DX-KK.)

Anderson had "real concerns because of [plaintiff's] ongoing pattern of violent behavior and intimidating behavior" and his disappearance from the office. (Tr. 389-90.)

Second, Ms. Holt-Knight, a senior supervisor and deputy director of Brooklyn APS in 2001 (Tr. 515), testified that Mr. Levitant failed to complete paperwork in a timely manner, and that he was "aggressive, confrontational, refused to do work that was assigned to him and pretty much was not following the program's guidelines." (Tr. 517-24; *see also* DX-B, DX-C, and DX-D (memoranda from 2001 sent to or from Ms. Holt-Knight describing difficulty training and supervising plaintiff and plaintiff's inappropriate behavior).)

Third, Ms. Brown, a Supervisor III at Brooklyn APS from 2001 to 2002, and a deputy director of Brooklyn APS as of 2003 (Tr. 550), testified regarding her interaction with plaintiff during the August 8, 2003 incident. Specifically, Ms. Brown testified that, because the plaintiff refused to follow Ms. Barnes' instructions to give a client a check for food, Ms. Brown called the plaintiff into her office to discuss the matter with her and Ms. Barnes. (Tr. 553-54, 562, 565.) After approximately fifteen minutes, the plaintiff came back to Ms. Brown's office with Ms. Alexander but refused to come inside the office. (Tr. 554, 556-57.) After Ms. Barnes left the office due to a verbal altercation with the plaintiff, the plaintiff

"rushed" into Ms. Brown's office, "got in [Ms Brown's]
face, . . . nose to nose," and said, "you don't know who you're
messing with, I will hurt you, I know where your family live and
your children, and I'm affiliated with the Russian mob and we
will hurt you." (Tr. 556-59; *see also* Tr. 556-57; DX-X
(memorandum dated August 8, 2003 from Ms. Brown to plaintiff
describing the August 8, 2003 incident).) After plaintiff made
that statement to Ms. Brown, Ms. Brown testified that plaintiff
left the office and that she called the police because she was
"really afraid." (Tr. 560-61.) On the same day, August 8, 2003,
Ms. Brown wrote a memorandum to Ms. Anderson requesting that
"immediate disciplinary action be initiated for [plaintiff's]
failure to comply with a directive from the Deputy Director [Ms.
Brown] and for threatening with bodily harm the Deputy Director."
(Tr. 556-67; DX-Y.) Finally, Ms. Brown also testified, contrary
to plaintiff's testimony, that the door to her office was open
during the entirety of the August 8, 2003 incident and that she
never slammed the door in Ms. Alexander's face. (Tr. 570-74.)

Fourth, Ms. Preudhomme, the director of Lombardi until
April 2004, testified that plaintiff's behavior in the office
was "aggressive, hostile, intimidating, [and] manipulative,"
that he was "not at his desk," and that he was "constantly
performing duties that were not assigned to him." (Tr. 583,

593.)  Ms. Preudhomme specifically testified about several documents introduced into evidence:

- A memorandum dated November 12, 2003, from Ms. Preudhomme to plaintiff, informing him that he was observed spending hours on the telephone and using the fax machine when his only assignment was to review the written policy and procedures of the Lombardi Program as part of his training program.  (Tr. 583-84; DX-II.)

- A memorandum dated February 13, 2004, from Ms. Lugo to Ms. Preudhomme, stating that plaintiff violated Ms. Lugo's instruction that he was not to leave the office to take an additional lunch break when he had ample time prior in the day to take a lunch break.  (Tr. 584-85; DX-PP.)

- A memorandum dated February 13, 2004, from Nat Weiner, another Lombardi supervisor, to plaintiff, following up on a meeting the same day among plaintiff, Ms. Preudhomme, Ms. Lugo, and Mr. Weiner, and reminding plaintiff, *inter alia*, that he was not to take excessive smoking breaks or spend excessive amounts of time on the phone attending to personal business. (Tr. 585-86; DX-OO.)

- A memorandum dated March 10, 2004, from Ms. Preudhomme to Mr. Waxman, the director of Personnel, stating that "plaintiff[,] who is expected to perform at least on a caseworker level[,] has continued to manipulate, maneuver and challenge authority in an insubordinate manner," and requesting a "resolution to this situation."  (DX-SS.)  Ms. Preudhomme testified that she "wrote this memo completely under duress" because plaintiff constantly challenged his supervisors and past memoranda regarding his behavior were not having any positive effect.  (Tr. 586-89.)

Additionally, Ms. Preudhomme denied telling plaintiff that he could not speak Russian on the telephone, but she did admit to telling plaintiff that he should not take personal

calls in the office.[8]  (Tr. 589, 591-92; *see also* Tr. 604-07 (Ms.
Preudhomme testifying that plaintiff "was consistently hollering
and screaming on the telephone in Russian, sometimes, and
sometimes in English.  And whenever you would ask him to quiet
down, he would not quiet down.  In fact, he would get
louder.").)  Ms. Preudhomme knew that plaintiff was making
personal calls when he was speaking Russian because plaintiff
was only assigned to call vendors--not clients--and those
vendors' staff all spoke English, so there was no need for
plaintiff to speak Russian for business purposes.  (Tr. 592,
597.)  Finally, contrary to plaintiff's testimony that he was
the only caseworker at Lombardi and that he was performing the
duties of a supervisor, Ms. Preudhomme testified that there were
approximately ten caseworkers at Lombardi and that plaintiff's
duties only involved calling vendors to obtain information on
clients because he was not yet assigned to go out into the field.
(Tr. 594-95.)

Last but not least, Ms. Barnes, plaintiff's direct
supervisor at Brooklyn APS beginning in 2001, testified that
plaintiff "required constant supervision" and "needed me to

---

[8]  Indeed, in a March 12, 2004 letter attached as Exhibit C to
Plaintiff's EEOC complaint dated July 13, 2004, plaintiff was reminded by
Bridget Simone, defendant's First Assistant Deputy Commissioner, of the
following personnel requirement:  "The telephone at your desk may only be
used for work-related conversations.  You may not use the telephone for
personal conversations, and any business conversations must be conducted in
English."  (Exhibit C to PX-5; *see also* DX-KK (memorandum dated December 3,
2003 from Ms. Preudhomme to plaintiff summarizing her efforts to instruct
plaintiff to cease personal use of the telephone.)

conduct one-on-one conferences with him concerning the work and how to complete the forms." (Tr. 663.) With respect to the August 8, 2003 incident, Ms. Barnes testified that the plaintiff and a client got into a dispute in the office regarding a food check that the client came to pick up, and that the client asked for Ms. Barnes, a supervisor, because plaintiff was "yelling at her inappropriately" and refusing to give her the check. (Tr. 668-72.) Ms. Barnes then instructed the plaintiff to give the client her check because he could not withhold it. (Tr. 672-73, 734-35.) Ms. Barnes further testified that, after plaintiff gave the client her check and the client left, plaintiff followed Ms. Barnes to her office and "approached [her], screaming, yelling, [and] telling [her] that [she] interfered with his casework skills." (Tr. 674, 729-30.) Ms. Barnes then went to Ms. Brown's office, where Ms. Brown called plaintiff into her office, and Ms. Barnes left the office when plaintiff refused to discuss anything in front of her. (Tr. 674-76.) Ms. Barnes also denied mocking plaintiff's accent or waving her fingers in his face during the August 8, 2003 incident. (Tr. 674-75, 724.) Finally, Ms. Barnes testified that on August 11, 2003, plaintiff called to inform her that he left the office on August 8, 2003 because he had a medical emergency. (Tr. 677, 725-26.)

*The Supervisor I Position at Brooklyn APS*

With respect to the process for interviewing candidates for the Supervisor I positions available at Brooklyn APS in March 2004, Ms. Anderson testified that Personnel provided her with a list of candidates to interview based on list numbers, which were determined by a candidate's written test score. (Tr. 497-99, 505.) Ms. Anderson also testified that she may have known the candidates being interviewed based on her past experience with them, such as the case with plaintiff, and that the interview consisted of "basic" questions. (Tr. 499-500.) On the day she interviewed plaintiff and four other candidates for Supervisor I positions at Brooklyn APS, Ms. Anderson testified that she had approval to select two candidates, and that after considering their interviews she selected the two individuals with the lowest list numbers (highest test score ranks). (Tr. 504-05, 507; *see* DX-TTT-2.) Specifically, Ms. Anderson testified that she was required to select candidates with lower list numbers, and that if a candidate with a lower list number than another candidate gave an acceptable interview, the candidate with the lower list number must be chosen for the promotion. (Tr. 504-05 ("Usually, we'll have to take the lower number. We can't jump the numbers. We're not allowed to jump numbers.").)

### III. The Instant Motions

After the plaintiff rested his case and again at the close of plaintiff's rebuttal case, but before the case was submitted to the jury, defendant moved for judgment as a matter of law pursuant to Rule 50(a). (Tr. 362, 366, 743.) The court reserved decision and submitted the case to the jury subject to a later decision on the legal questions raised by the motion. *See* Fed. R. Civ. P. 59(b). After the jury rendered its verdict in favor of plaintiff only on the retaliation claim, defendant renewed its motion for judgment as a matter of law pursuant to Rule 50(b) (*see* Tr. 864) and also moved in the alternative under Rule 59(a) for a new trial without qualification, or conditioned on the plaintiff's refusal to agree to a reduction of the jury award (remittitur), *see* Fed. R. Civ. P. 50(b), 59(a).[9] Because neither party has challenged the jury's verdict in favor of the defendant on plaintiff's race and national origin discrimination claims, the jury's verdict with respect to those claims will remain undisturbed and those claims will not otherwise be discussed.

---

[9]  With the court's permission, defendant filed its motions on June 4, 2012 (*see* ECF No. 151, Defendant's Memorandum of Law in Support of Its Motion for Judgment as a Matter of Law or in the Alternative to Reduce the Jury's Award or For a New Trial ("Def. Mem.")), plaintiff filed an opposition brief (*see* ECF No. 153, Plaintiff's Memorandum of Law in Opposition to Defendant's Motion under FRCP Rule 50 ("Pl. Opp'n")), and defendant filed a reply brief (*see* ECF No. 157, Defendant's Reply Memorandum of Law in Further Support of Its Motion for Judgment as a Matter of Law or in the Alternative to Reduce the Jury's Award or For a New Trial ("Def. Reply")).

## IV.  The Rule 50 Standard

Rule 50 "generally imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash*, 654 F.3d at 333 (quoting Fed. R. Civ. P. 50(a)(1)).  Under Second Circuit case law, a "district court may set aside a jury's verdict pursuant to Rule 50 only where [1] there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [2] there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012) (internal quotation marks omitted); *see also Cash*, 654 F.3d at 333 ("In short, a Rule 50 motion may be granted only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that 'a reasonable juror would have been compelled to accept the view of the moving party.'").  In deciding a Rule 50 motion, the court must view the evidence in light most favorable to the non-moving party, drawing all reasonable inferences in

his favor, and the court cannot determine the credibility of witnesses, weigh conflicting evidence, or substitute its judgment for that of the jury.  *Bucalo*, 691 F.3d at 128.

Rule 50(a) specifies that the motion must be made before the case is submitted to the jury, and also provides that "[t]he motion must specify the judgment sought and the law and facts that entitle the movant to the judgment," Fed. R. Civ. P. 50(a)(2), which is an "obligatory" requirement.  *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012).  "'[B]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.'"  *Id.* at 153 (quoting Fed. R. Civ. P. 50(b) Advisory Committee's note (2006)).[10]  "As to any issue on which proper Rule 50 motions were not made, [judgment as a matter of law] may not properly be granted by the district court . . . unless that action is required in order to prevent manifest injustice."  *Id.*

Here, with the plaintiff's consent, defendant did not make a specific showing of the legal and factual bases for its preverdict Rule 50(a) motion.  Rather, before plaintiff presented the final evidence in his case, a deposition

---

[10]  The rationale underlying this requirement is that "[t]he earlier [preverdict] motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available.  The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury."  Fed. R. Civ. P. 50(b) Advisory Committee's note (2006).

transcript, defendant requested permission from the court that it be deemed to have made its Rule 50 motion "for all purposes" so that the trial could proceed directly to defendant's witnesses without having to excuse the jury for defendant to make its Rule 50(a) motion, a course of action the plaintiff and the court accepted. (Tr. 362.) Plaintiff explicitly stated that he had no objection to defendant making its Rule 50 motion "on all grounds it could be made." (Tr. 366.) Moreover, defendant once again moved for judgment as a matter of law at the end of plaintiff's rebuttal case (Tr. 743); thus, plaintiff could not reasonably have thought that defendant's initial view of the insufficiency of the evidence had been overcome and that there was no need to produce anything more in order to avoid the risk of judgment as a matter of law. *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 199 (2d Cir. 2004).

Even though defendant did not specify the factual and legal bases for its Rule 50(a) motion prior to submission of the case to the jury, the court finds that judgment as a matter of law is required under these circumstances in order to prevent manifest injustice. Indeed, plaintiff explicitly did not object to defendant making a broad Rule 50 motion on "all grounds it could be made" (Tr. 366), and this case falls into that narrow category of cases "'where a jury's verdict is wholly without legal support,'" thus enabling the court to consider the

defendant's motion on the grounds stated. *See Jacques*, 386 F.3d at 199 (quoting *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 129 (2d Cir. 1999) (describing circumstances in which a party's failure to comply with the procedural requirements of Rule 50 may be excused)).

**V. The Insufficiency of the Evidence to Support the Jury Verdict in Favor of Plaintiff on His Retaliation Claim**

**A. The Legal Standard for Retaliation Under Title VII**

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). A retaliation claim under Title VII is generally analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> First, the plaintiff must establish a prima facie case of retaliation by showing: (1) his participation in protected activity; (2) defendant's knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Second, if the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action. Third, if the employer does so, then the burden shifts back to the plaintiff to prove that retaliation was a

substantial    reason    for    the    adverse    action.

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556,

567 (2d Cir. 2011) (citing *United States v. Hicks*, 593 F.3d 159,

164-65 (2d Cir. 2005)).

Here, the parties agree that, as established at trial,

the first "protected activity" that plaintiff engaged in for

purposes of his retaliation claim under Title VII was the

internal EEO complaint he filed on August 12, 2003, as

previously decided by Judge Bianco, and that plaintiff can only

recover for retaliatory acts on or after August 12, 2003. (*See*

Def. Mem. at 4; Pl. Opp'n at 2.)  Plaintiff's other "protected

activity" established at trial consisted of plaintiff's charges

of discrimination to the EEOC on February 20, 2004 and July 13,

2004.  (PX-4, PX-5); *see Levitant*, 625 F. Supp. 2d at 107.

Additionally, the parties do not appear to dispute and the trial

record establishes that plaintiff satisfied the second element

of his prima facie case, that is, defendant's knowledge of

plaintiff's protected activity.

Although the first two elements of plaintiff's

retaliation claim are supported by the trial record, defendant

asserts that it is entitled to judgment as a matter of law on

two grounds.  First, defendant asserts that there was legally

insufficient evidence for a jury to conclude that plaintiff

suffered from a materially adverse employment action with

respect to the three bases asserted: plaintiff's suspension while on medical leave, the weeklong delay in his reassignment to Lombardi after returning from medical and annual leave, and his transfer to Lombardi. (Def. Mem. at 2-8; Def. Reply at 2-4.) Second, defendant argues that that there was legally insufficient evidence for the jury to conclude that retaliation was a motivating factor in defendant's failure to promote the plaintiff because the undisputed evidence at trial established that plaintiff would not have been promoted regardless of his complaints of discrimination due to his lower civil service rank. (Def. Mem. at 8-10; Def. Reply at 4-5.) The court will address each of these in turn.

### B. Whether Plaintiff Suffered an Adverse Employment Action

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67. In order to satisfy this element of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68; *accord Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011). As stated by the Second Circuit, "'[a] plaintiff

sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. . . . An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006); *see also Tepperwien*, 663 F.3d at 568 ("Actions that are trivial harms -- i.e., those petty slights or minor annoyances that often take place at work and that all employees experience -- are not materially adverse." (internal quotation marks omitted)). Examples of materially adverse employment actions include, *inter alia*, termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Joseph*, 465 F.3d at 90.

The test for material adversity is an objective one based on the reactions of a reasonable employee, and the court should consider the context of alleged adverse acts as "some actions may take on more or less significance depending on the context." *Tepperwien*, 663 F.3d at 568. Additionally, "alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance

when they are viewed as part of a larger course of conduct."
*Id.*

Defendant argues that there was legally insufficient
evidence at trial for the jury to find that the requirements of
a materially adverse employment action were satisfied in
connection with three employment actions by the defendant after
August 12, 2003:  (1) plaintiff's suspension after his departure
from Brooklyn APS on August 8, 2003 and during his subsequent
vacation and medical leave of absence; (2) the weeklong delay in
plaintiff's reassignment to Lombardi after his return from
medical leave; and (3) plaintiff's transfer to Lombardi, which
entailed a longer commute, the performance of supervisory tasks
with a caseworker title and salary, and a prohibition on
plaintiff speaking Russian on personal calls in the office.  The
court concludes that based on the evidentiary trial record, no
reasonable jury could have found that these actions, as
described by the plaintiff and considered both individually and
in the aggregate, were legally sufficient to constitute
materially adverse employment actions.

1.  *Plaintiff's Suspension*

According to plaintiff's own testimony, after the
August 8, 2003 incident with Ms. Barnes and Ms. Brown and prior
to starting work at Lombardi in early November 2003, plaintiff
took four weeks of vacation, was on medical leave for

approximately two months at his own request, and was informed

that he was suspended at an unspecified time during that period.

(Tr. 88-93.)  Specifically, plaintiff testified as follows:

> [W]hile I was on the sick leave, I found out that I
> was brought up on charges being on sick leave and was
> suspended being caught on vacation and on a sick
> leave.  That's how I found out.  I received a notice
> from the union that there is an attorney assigned to
> represent me on the charges stemming from the
> beginning of June 25, 2002 up to 2003.

(Tr. 93.)  Other than plaintiff's vague testimony, plaintiff

presented no other evidence concerning the charges that formed

the basis of the suspension, the duration of the suspension--

whether it was a single day or more,[11] and whether plaintiff was

suspended without pay or had to suffer any other penalty.

Defendant, however, presented undisputed testimonial and

documentary evidence that on August 8, 2003, four days prior to

plaintiff filing his EEO complaint on August 12, 2003, Ms. Brown

submitted a formal request for disciplinary action against

plaintiff based on his insubordination and threatening conduct

---

[11]   In his opening, one of plaintiff's lawyers stated that
plaintiff was "suspended for a period of approximately 20 days" (Tr. 13), and
during summation, another lawyer representing plaintiff stated that he was
"suspended for two weeks" (Tr. 763), but the record lacks supporting
testimony and exhibits for both of plaintiff's counsels' statements.  These
inconsistent statements by plaintiff's two attorneys were not supported by
any evidence.  Indeed, it is undisputed that plaintiff's last day of work at
Brooklyn APS was August 8, 2003, and that plaintiff started work at Lombardi
on November 3, 2003.  (*See* DX-KK at D0257.)  Based on plaintiff's own
testimony that after August 8, 2003, he took four weeks of paid vacation
(roughly August 8, 2003, to September 5, 2003) and was granted two months of
medical leave after August 8, 2003 (roughly September 6, 2003 to November 6,
2003), a jury had no basis on which to ascertain the length of plaintiff's
suspension, or the damages, if any, incurred, because plaintiff reported back
to work in or around the end of October 2003.  (Tr. 95.)

in connection with the August 8, 2003 incident. (*See* DX-X, DX-Y.)

In determining whether a suspension rises to the level of an adverse employment action, "'[t]he relevant question is . . . whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment.'" *Brown*, 673 F.3d at 150 (quoting *Joseph*, 465 F.3d at 92 n.1)); *see also Joseph*, 465 F.3d at 91 (recognizing that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."). In the *Joseph* case, the Second Circuit found that administrative leave or suspension with pay does not, without more, constitute an adverse employment action, *Joseph*, 465 F.3d at 91-92, and in the *Brown* case, the Second Circuit held the same where there was also a loss of overtime pay as a direct result of the suspension, *Brown*, 673 F.3d at 150-51.

Based on the complete lack of any evidence that plaintiff's suspension was without pay, otherwise changed the terms and conditions of his employment, or was unreasonable or procedurally flawed, a jury could not find that the suspension constituted a materially adverse employment action. Indeed,

according to plaintiff's own testimony, he was suspended when he
was already voluntarily out of the office for an extended period
of almost three months on vacation and requested medical leave,
and thus the suspension did not prevent him from returning to
work or reduce his work responsibilities in any manner.  Nor is
there any evidence suggesting that plaintiff would have returned
to work sooner had it not been for the suspension.  Because
there is no evidence that plaintiff's suspension had *any*
discernible employment consequences--trivial or not--the jury
could not have found that the suspension, "well might have
dissuaded a reasonable worker from making or supporting a charge
of discrimination."  *Burlington*, 548 U.S. at 68; *see Gibson v.
Wyeth Pharms., Inc.*, No. 07 Civ. 946, 2011 U.S. Dist. LEXIS
23935, at *20-21 (S.D.N.Y. Mar. 9, 2011) (finding that three-day
suspension that may or may not have been without pay did not
rise to the requisite level of materiality where there was no
evidence that "the suspension worked such an alteration in the
terms and conditions of Plaintiff's employment"); *Dobrynio v.
Cent. Hudson Gas & Elec. Corp.*, 419 F. Supp. 2d 557, 564-65
(S.D.N.Y. 2006) ("[B]eing suspended [without pay] for a single
day, with no long term consequences whatever, is not an
actionable adverse employment action because it is not
*material*.").  Accordingly, there was insufficient evidence
presented at trial for the jury to conclude that plaintiff's

suspension at some unspecified point in time when he was on vacation and requested medical leave constituted a materially adverse employment action.[12]

>    *2.    The Weeklong Delay in Reassigning Plaintiff to Lombardi After his Return from Medical Leave*

In or around the end of October 2003, after his four-week vacation and two months of medical leave, and before his transfer to Lombardi, plaintiff spent a week at Personnel. (Tr. 95.) At Personnel, plaintiff testified that he "had to sit without any assignment" for the duration of each work day in "a

___

[12] Alternatively, irrespective of whether the suspension constituted a materially adverse employment action, the only basis for a causal connection between the filing of the EEO complaint on August 12, 2003 and the suspension is their temporal proximity, which is itself uncertain because the date plaintiff received notice of his suspension was not in evidence at trial. Indeed, plaintiff's counsel argues that, because defendants' witnesses did not testify as to when plaintiff was suspended, the jury was permitted "to infer that the act of filing a complaint was a factor in the decision to suspend." (Pl. Opp'n at 8.) While "[i]t is, of course, true that temporal proximity can demonstrate a causal nexus," an inference of retaliation does not arise "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). Here, defendants presented ample evidence regarding plaintiff's insubordination and disciplinary issues at Brooklyn APS prior to the first instance of protected activity on August 12, 2003, and five days prior to August 12, Ms. Barnes filed a formal request for disciplinary action against the plaintiff. Thus, the suspension directly followed a formal request for disciplinary action that preceded the protected activity. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Because there is no evidence in the record, viewed in the light most favorable to the plaintiff, besides temporal proximity from which the jury could infer retaliation, a reasonable jury could not find that the suspension was a retaliatory act or that defendant's explanation was pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.").

very small space," and he was "monitored by [a] security guard."
(*Id.*)  It was undisputed at trial that, because plaintiff was
returning from medical leave, Personnel had the discretion to
reassign plaintiff internally from Brooklyn APS to another
office.  (Tr. 257-61; DX-HH.)  Additionally, plaintiff also
testified that he "did not insist" on being returned to Brooklyn
APS.  (Tr. 260-61.)

Under these circumstances, a jury could not find that
the weeklong delay in plaintiff's reassignment upon his return
from an extended vacation and medical leave constituted an
adverse employment action.  Plaintiff failed to present any
evidence that he lost any salary, rank, or benefits as a result
of the week he spent at Personnel, that plaintiff was required
to stay in Personnel any longer than was necessary to arrange
his reassignment, or that the delay or lack of any work
assignments in any way negatively affected his career.  *See*
*Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d
Cir. 2000) (finding that a delay in reassignment was not an
adverse employment action where there was no evidence that
plaintiff was denied an available transfer, that employer failed
to pay his salary during the interim period, or that the delay
in any way harmed plaintiff's career).

Additionally, although plaintiff was required to
remain in a "very small space" and was monitored by a security

guard, he presented no evidence that these conditions amounted to anything more than minor annoyances or inconveniences or that he--as opposed to others awaiting reassignment--was specifically made to endure such conditions. *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (stating that minor annoyances do not constitute actionable retaliation); *Lytle v. JPMorgan Chase*, No. 08 Civ. 9503, 2012 U.S. Dist. LEXIS 15599, at *70 (S.D.N.Y. Feb. 8, 2012) ("While it may be true that [the employer] could have better utilized its facilities to avoid cramped working spaces . . . , the Court should not act as a super personnel department that second guesses employers' business judgments." (citations omitted)); *Hall v. N.Y. City DOT*, 701 F. Supp. 2d 318, 336 (E.D.N.Y. 2010) (finding that placement of a security camera in plaintiff's work space was not a materially adverse employment action). Accordingly, the court finds that there was insufficient evidence presented at trial for the jury to find that a reasonable employee would have been dissuaded from engaging in protected activity based on a weeklong delay in receiving a reassignment upon returning from an extended annual and medical leave.

Alternatively, the court finds that, because it is undisputed that plaintiff spent the week at Personnel awaiting a reassignment due to his return from medical leave, defendant satisfied its burden to articulate a legitimate non-retaliatory

reason for the reassignment. *Tepperwien*, 663 F.3d at 567. As there is no evidence in the record suggesting any other reason, whether retaliatory or not, for the week plaintiff spent at Personnel, there was insufficient evidence for the jury to conclude that plaintiff satisfied his burden to establish that retaliation was a substantial reason for his placement at Personnel for a week. *Id.*

### 3. The Transfer to Lombardi

Defendant argues that, based on the evidence presented at trial, defendant's transfer of plaintiff to Lombardi did not constitute a materially adverse employment action. As stated by the Second Circuit, "[a] lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff[']s employment in a materially negative way." *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002); *see also Lore*, 670 F.3d at 170 ("The transfer of an employee from an elite position to one that is less prestigious . . . with little opportunity for professional growth is sufficient to permit a jury to infer that the transfer was a materially adverse employment action." (internal quotation marks omitted)); *Beyer v. County of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008) (stating that in cases involving involuntary transfers, the Second Circuit has held that "an adverse

employment action can exist when an employee's new assignment is 'materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement.'" (quoting *Galabya*, 202 F.3d at 641); *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005) ("Without a real change in the conditions of employment, a transfer is only a mere inconvenience or an alteration of job responsibilities, and hence not materially adverse." (internal citations omitted)). "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71.

Here, plaintiff presented no evidence that his transfer to Lombardi entailed disciplinary action, loss of salary, rank, or benefits, more burdensome work, less prestigious work, or work that was less conducive to his career advancement. Additionally, plaintiff did not present any evidence that the transfer was involuntary or that he made, but was denied, a request to be transferred to one of defendant's

other departments.[13]  Rather, Plaintiff argues that the transfer

from Brooklyn APS to Lombardi was materially adverse because:

(1) his commute to work was longer; (2) he was performing

supervisory level work at the salary and title of a caseworker;

and (3) he was prohibited from speaking Russian in the office on

personal calls.  (Pl. Opp'n at 9-11.)  Each of these will be

addressed in turn.

First, plaintiff testified that the Lombardi office

was "very far" from his residence in Brooklyn.  Although

plaintiff did not testify as to the exact location of his

residence in Brooklyn, the jury could reasonably infer that his

commute to work became longer as a result of being transferred

from Brooklyn APS, which was located at 250 Livingston in

Brooklyn, to the Lombardi office located at 309 East 94th Street

in Manhattan.  Plaintiff's longer commute as a result of the

transfer to Lombardi is only an inconvenience, however, and

cannot constitute an adverse employment action.  *See Formilien*

*v. Beau Dietl & Assocs.*, No. 10 Civ. 3077 (NRB), 2012 U.S. Dist.

LEXIS 86523, at *33 (S.D.N.Y. June 21, 2012) ("Even where the

inconvenient location of the new workplace combines with less

favorable hours of employment, a transfer may not amount to an

---

[13] Defendant introduced a memorandum dated October 28, 2003 indicating that plaintiff requested to be sent back to Brooklyn APS and in fact became hostile when he was told that Personnel had the discretion to reassign him because he was returning from a medical leave.  (DX-HH.)  In response to this document, plaintiff stated that he has not seen it and stated that he "did not insist" on returning to Brooklyn APS.  (Tr. 261.)

adverse employment action."); *Antonmarchi v. Consol. Edison Co. of N.Y., Inc.*, No. 03 Civ. 7735 (LTS)(KNF), 2008 U.S. Dist. LEXIS 75458, at *47 (S.D.N.Y. 2008) ("[A]n inconvenience, such as an increased commute or unfavorable hours, does not constitute an adverse employment action for the purposes of Title VII."); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("The only substantive difference between the two positions was that the Elmhurst position resulted in a longer commute - which is an inconvenience, not an adverse employment action.").

Second, plaintiff argues that his performance of the duties of a supervisor without receiving the title or pay of a supervisor amounted to an adverse employment action. Accepting that plaintiff did indeed assume the role of a supervisor while at Lombardi--an issue in dispute at trial--the jury could still not find that this alteration of responsibilities, without more, met the legal standard for a materially adverse employment action. *Brown*, 673 F.3d at 150 ("An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." (internal quotation marks omitted)). A materially adverse employment action stemming from a transfer must "alter[] the terms and conditions of the plaintiff's employment in a materially *negative* way," *Patrolmen's Benevolent Ass'n of N.Y.*, 310 F.3d at 51 (emphasis

added), and typically involves an employee being required to perform less prestigious, less skillful, and less career-advancing work, *Beyer*, 524 F.3d at 165. Here, in contrast, according to plaintiff's own testimony, he assumed the responsibilities of a supervisor and thus, if anything, performed more prestigious and career-advancing work than he had in his previous caseworker position at Brooklyn APS.

Moreover, the fact that plaintiff did not receive a title commensurate with his supervisory role or an increase in pay does not render such a change in responsibilities materially adverse where plaintiff presented no evidence that the supervisory work he performed with the title and pay of a caseworker was more burdensome or stressful, involved longer hours, was humiliating, or was otherwise worse for his career than his caseworker position. Given that plaintiff himself sought to obtain a supervisor position, a jury could not find based on the evidence at trial that a reasonable employee under similar circumstances would be deterred from engaging in protected activity by taking on a supervisor's role with no additional burden. Indeed, an adverse employment action is not established merely because an employer requests an employee to perform tasks regularly performed by his or her supervisor but entailing no extra burden.

Third, plaintiff testified that his supervisor, Ms. Preudhomme, prohibited him from speaking Russian on personal telephone calls in the office, including on his own cell phone during his lunch hour. It was not disputed at trial that plaintiff had no reason to speak a language other than English in connection with his duties with vendors at Lombardi. (Tr. 592 (testimony of Ms. Preudhomme that "it's not a requirement to speak to any client in Russian, and it's certainly not a requirement to speak to any vendor in Russian, because all of the vendors' staff members speak English."); see also Tr. 597 (testimony of Ms. Preudhomme that plaintiff had no clients, Russian or otherwise, and there were no instances in which plaintiff would have to speak to a vendor in Russian).) Assuming, as the court must, that the jury disregarded Ms. Preudhomme's testimony that she never told plaintiff not to speak Russian on the telephone but rather instructed him not to make personal calls in the office, a prohibition on speaking a certain language during personal calls in the office--or even a general prohibition on making personal calls in the office-- cannot constitute an adverse employment action based on the evidence presented at trial.

Plaintiff has provided no evidence that either speaking Russian during personal calls in the office or having the ability to make personal calls generally was a term or

condition of his employment at Lombardi, or that it was related in any manner to his employment. Plaintiff therefore cannot establish that, even if the jury accepted that such a prohibition had been ordered, it altered the terms and conditions of his employment in a materially negative way. *See Meckenberg v. New York City Off-Track Betting*, 42 F. Supp. 2d 359, 381 n.13 (S.D.N.Y. 1999) (finding that a ban on an employee's use of the work telephone for personal calls was "tangential if not irrelevant to [the employee's] ability to perform her job, and constitutes a mere inconvenience that is not an adverse employment action."); *see also Marxkors v. GTE Wireless, Inc.*, 19 Fed. Appx. 476, 477-78 (8th Cir. 2001) (affirming finding that employer had nondiscriminatory reason for adverse employment action based, in part, on employee making personal calls in violation of company policy); *Sharp v. Milton S. Hershey Med. Ctr.*, No. 1:10-CV-01713, 2011 U.S. Dist. LEXIS 137518, at *24-25 (M.D. Pa. Nov. 1, 2011) (admonishing employee for making personal calls during work "not adverse employment action[]."); *Hernandez v. Indus. Med. Assocs.*, No. 04-CV-6491, 2006 U.S. Dist. LEXIS 69155, at *40-41 (W.D.N.Y. Sept. 14, 2006) (reminding employee about, *inter alia*, policy to keep personal calls to a minimum not an adverse employment action); *Visco v. Community Health Plan*, 957 F. Supp. 381, 387-88 (N.D.N.Y 1997) (finding employee's excessive use of phone for personal calls "a

legitimate, nondiscriminatory reason for terminating the plaintiff's employment.").

If anything, plaintiff's testimony that other non-English languages, particularly Spanish, were freely spoken in Lombardi may raise an inference of discriminatory intent based on national origin,[14] on which claim the jury found against plaintiff and in defendant's favor. This does not mean, however, that a ban on speaking Russian during personal calls constitutes an adverse employment action, particularly where it was undisputed that there was no reason for plaintiff to speak Russian in order to perform his job at Lombardi.[15] (*See, e.g.*, Tr. 592, 597.) Moreover, plaintiff does not dispute Ms. Alexander's trial testimony that Spanish and other languages, including Russian, were spoken in connection with serving defendants' clientele at the Lombardi Center. (Tr. 327-28.)

---

[14] *See Velasquez v. Goldwater Mem. Hosp.*, 88 F. Supp. 2d 257, 263 (S.D.N.Y. 2000) ("[I]f plaintiff were able to present evidence that other employees were permitted to speak in, for example, Chinese or Portugese, but not Spanish, such evidence could support an inference of intentional discrimination on the basis of national origin.")

[15] Additionally, for the same reasons, the court finds that Ms. Preudhomme's admonishment that defendant not speak Russian in the office during what she viewed as plaintiff's excessive and disruptive personal calls (*See, e.g.*, Tr. 583, 591-92, 604, 605-06, 607) was not "sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered [plaintiff's] working conditions" such that those comments amounted to a hostile work environment in retaliation for plaintiff's protected activity. *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (internal quotation marks omitted). Indeed, such a prohibition was not physically threatening and did not interfere with plaintiff's work performance, nor did plaintiff present any specific evidence regarding the frequency of the directive or whether the directive was made in a manner that humiliated him. *See Pucino v. Verizon Commc'n, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010).

Accordingly, for all of the above reasons, the court finds that there was not a legally sufficient evidentiary basis for a jury to find that plaintiff's transfer to Lombardi was a materially adverse employment action. This is particularly true because it is undisputed that plaintiff was transferred to Lombardi because he was returning from an extended medical leave of absence and plaintiff presented no evidence that he ever opposed the transfer to Lombardi.

### 4.    *The Actions in the Aggregate*

Putting aside the denial of plaintiff's failure to promote, which is a discreet act that occurred four months after plaintiff's transfer to Lombardi and will be addressed separately below, the court does not find that plaintiff's suspension, delay in reassignment, and transfer to Lombardi, whether considered individually or in the aggregate, constitute a materially adverse employment action under the law. The undisputed evidence at trial, viewed in the light most favorable to the plaintiff, established that (1) plaintiff was suspended for an unknown duration of time while he was on vacation and medical leave; (2) upon returning from medical leave, plaintiff had to wait one week without any assignments and without loss of pay for a transfer to Lombardi; and (3) plaintiff's transfer to Lombardi entailed a longer commute, the assumption of certain tasks performed by supervisors, and a prohibition on speaking

Russian in the office on personal calls. The bottom line, however, is that plaintiff failed to present any evidence that he endured a materially adverse change in the terms and conditions of his employment. *Brown*, 673 F.3d at 150. Indeed, plaintiff presented no evidence that he suffered from a material, or any, loss of wages, salary, or benefits, a less distinguished title, or significantly diminished material responsibilities, nor did he present any evidence that he was adversely affected in any material way by the actions of the defendant. *Joseph*, 465 F.3d at 90.

The undisputed context is also significant. It was plaintiff's own request for a two-month medical leave after four weeks of vacation that resulted in his unopposed reassignment and transfer to Lombardi. Although plaintiff had to wait a week for his reassignment to Lombardi, which involved a longer commute, plaintiff was assigned duties that usually were assigned to those supervising him, thus indicating, if anything, a positive development in his employment opportunities with defendant. There is no evidence that at any point in time plaintiff was not paid his regular salary, that he worked longer hours, or that he was in any way harmed as a result of defendant's actions, outside of the minor annoyances of a weeklong delay in reassignment, a longer commute, and the inability to take personal calls in Russian in the office.

Viewing all of defendant's actions in the aggregate, the court concludes that a reasonable employee in plaintiff's situation would not have been deterred from engaging in protected activities. *See Tepperwien*, 663 F.3d at 572 ("Taken in the aggregate, the actions still did not adversely affect [plaintiff] in any material way. Zero plus zero is zero." (internal quotation marks omitted)). Plaintiff therefore failed to satisfy his burden of proving retaliation by presenting legally sufficient evidence of a materially adverse employment action by defendant. Indeed, "while the test is an objective one, it is relevant that plaintiff himself was not deterred from complaining," as he filed two more charges of discrimination to the EEOC after his transfer to Lombardi, the latter as late as July 2004, after he was denied a promotion. *Id*.

**C. Defendant's Failure to Promote Plaintiff to Supervisor I.**

An employer's failure to promote is a "discrete act" that "constitutes a separate actionable 'unlawful employment practice'" for purposes of Title VII. *Nat'l Passenger Railroad Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Even though there is no dispute that a failure to promote can constitute an adverse employment action assuming that plaintiff established his prima facie case with respect to defendant's failure to promote him, there was legally insufficient evidence for a jury to conclude

that retaliation was a motivating factor in the denial of the promotion.

First, on March 24, 2004, the day plaintiff was interviewed and denied the promotion for Supervisor I at Brooklyn APS, it was undisputed that five candidates were interviewed for two Supervisor I positions, and that the two candidates selected had the lowest list numbers--meaning the highest scores--based on their scores on a written test. Specifically, the two candidates hired had list numbers 316 and 372, while plaintiff had a list number of 478.5. (DX-TTT2.) It was also undisputed at trial that candidates with lower list numbers were required to be selected before those with higher list numbers, assuming all candidates gave acceptable interviews. As Ms. Anderson testified, because the two individuals with the lower list numbers gave acceptable interviews, they were selected for a promotion over plaintiff and two other candidates with higher list numbers who were also interviewed the same day. Thus, defendant sustained its burden of establishing a legitimate non-discriminatory reason for not selecting plaintiff for a promotion--plaintiff had a higher list number or lower rank than those ultimately hired for the position. *See Isaac v. City of New York*, 701 F. Supp. 2d 477, 494 (S.D.N.Y. 2010) (finding no retaliation for failure to promote where plaintiff was ranked 1,277 on the civil service

list and the lowest rank that was eligible for promotion was 582).

Second, plaintiff did not present legally sufficient evidence for a jury to conclude that defendant's legitimate, non-discriminatory reason for promoting those with lower list numbers over plaintiff was pretextual or that retaliation was a substantial reason for the denial of his promotion. The only evidence plaintiff presented was his testimony that the interview was short, that he was asked "routine questions," that Ms. Anderson did not look into his eyes, and that he was informed within ten minutes after his interview that he was denied the promotion and told to leave. (Tr. 121-22.)[16] Plaintiff, however, did not present any evidence from which a jury could find pretext by showing, for instance, (1) that candidates with higher list numbers or lower ranks were selected over those with lower list numbers or higher ranks in other interview pools, (2) that other candidates had more substantive or longer interviews, or (3) that other candidates received decisions in the mail or otherwise several days after their interview as opposed to immediately after the interview.

_____

[16] Although there was evidence presented at trial of conflicts between plaintiff and Ms. Anderson and Ms. Barnes, all such conduct preceded August 12, 2003, the first instance of defendant's protected activity, and therefore could not be a basis for a finding of retaliation with respect to the failure to promote plaintiff. The court also agrees with defendant that the fact that plaintiff was interviewed by Ms. Anderson and Ms. Barnes, by itself, cannot constitute an adverse employment action. (Def. Reply at 4.) Rather, it is the failure to promote the plaintiff that is the materially adverse action.

Indeed, Ms. Anderson's testimony that the interviews generally consisted of "basic" questions and that interviews of those whom, like plaintiff, she knew were usually shorter than interviews of those with whom she was not previously familiar, is consistent with plaintiff's testimony.

Finally, even if there were evidence from which the jury could infer that retaliation was a motivating factor in defendant's decision not to promote plaintiff, defendant "has proved that it would have taken the same action for a permissible reason." *Bickerstaff v. Vassar College*, 196 F.3d 435, 445-46 (2d Cir. 1999); *see also Fleming v. MaxMara United States, Inc.*, 644 F. Supp. 2d 247, 264 (E.D.N.Y. 2009) ("If the plaintiff is successful in proving that retaliatory animus was a motivating factor, the employer bears the burden of proving that it would have taken the same action for a permissible reason."). Here, defendant presented uncontested evidence that there were only two Supervisor I positions available to be filled from the five individuals participating in plaintiff's interview pool, and that defendant was required to make promotion decisions based on the order of candidates' list numbers as long as those candidates gave acceptable interviews. Therefore, even if defendant sought to retaliate against plaintiff, defendant would still have denied plaintiff a promotion because he was ranked third in the interview pool based on his score on the civil

service written test, and there is no evidence that the higher ranked candidates gave unacceptable interviews.  As it is not disputed that denying a promotion to someone with a lower civil service rank is permissible, defendant has satisfied its burden of establishing that it would have denied plaintiff's promotion for a permissible reason even if there were evidence of a retaliatory motive.  Accordingly, judgment as a matter of law must be entered in favor of the defendant with respect to plaintiff's failure to promote claim as well.

**VI.  Conditional Ruling on Defendant's Motion for New Trial**

As noted above, defendant moved in the alternative under Rule 59(a) for a new trial or a conditional remittitur. (Def. Mem. at 10.)  Because the court is granting defendant's renewed motion for judgment as a matter of law under Rule 50(b), the court "must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed" and state the grounds for its conditional ruling.  Fed. R. Civ. P. 50(c)(1).  Under Rule 59, a new trial may granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  In considering a Rule 59 new trial motion, the court "is free to weigh the evidence . . . and need not view it in the light most favorable to the verdict winner."  *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124,

134 (2d Cir. 1998).  If this court's decision to grant

defendant's Rule 50 motion for judgment as a matter of law is

later reversed or vacated on appeal, the court would grant

defendant's motion for a new trial on plaintiff's retaliation

claim on three grounds.

### A.    The Verdict Was Against the Weight of the Evidence

Under Second Circuit law, "[i]t is well established

that the trial judge enjoys 'discretion to grant a new trial if

the verdict appears to [the judge] to be against the weight of

the evidence' . . . ."  *Lore*, 670 F.3d at 176-77 (brackets in

original) (quoting *Gasperini v. Center for Humanities, Inc.*, 518

U.S. 415, 433 (1996)); *see also Raedle v. Credit Agricole

Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) ("A court may grant a

new trial for any reason . . . including if the verdict is

against the weight of the evidence." (internal quotation

omitted)); *AMW Materials Testing, Inc. v. Town of Babylon*, 584

F.3d 436, 456 (2d Cir. 2009) ("A district court may grant a new

trial pursuant to Rule 59 even when there is evidence to support

the jury's verdict, so long as the court 'determines that, in

its independent judgment, the jury has reached a seriously

erroneous result or its verdict is a miscarriage of justice.'"

(quoting *Nimely v. City of New York,* 414 F.3d 381, 392 (2d Cir.

2005))); *Green v. City of New York*, 359 Fed. Appx. 197, 199 (2d

Cir. 2009) (district court can grant motion "'even if there is

substantial evidence supporting the jury's verdict.'" (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003))).

For the same reasons discussed in Part V, the court would grant a new trial because the verdict is against the weight of the evidence in that the alleged retaliatory acts "could not have deterred a reasonable worker from pursuing a charge of discrimination, and thus the jury reached a seriously erroneous result." *Tepperwien v. Entergy Nuclear Operations, Inc.*, No. 07-CV-433, 2010 U.S. Dist. LEXIS 143993, at *31 (S.D.N.Y. Mar. 16, 2010), *aff'd*, 663 F.3d 556 (2d Cir. 2011). Based on the evidence at trial, the court cannot conclude that a reasonable jury could have found that plaintiff was subjected to a materially adverse employment action, or that retaliation played a substantial role in defendant's failure to promote him. Therefore, the verdict was against the weight of the evidence and a new trial is warranted.

**B.    The Jury Award of $250,000 in Compensatory Damages Was Excessive**

The court's discretion to grant a new trial "'includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'" *Lore*, 670 F.3d at 176-77 (quoting *Gasperini*, 518 U.S. at 433). "[A] jury's damages award may not be set aside unless the award is so high

as to shock the judicial conscience and constitute a denial of justice." *Manganiello v. City of New York*, 612 F.3d 149, 168 (2d Cir. 2010) (internal quotation marks omitted); *see also Scala v. Moore-McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) ("While a jury has broad discretion in measuring damages, it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." (internal quotation marks omitted)); *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005) ("'A plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them.'" (citation omitted)).

Both parties agree that plaintiff can only recover compensatory damages in connection with plaintiff's claims of retaliatory conduct by defendant on or after August 12, 2003, the first instance of plaintiff's protected activity, and that plaintiff cannot recover on his retaliation claim for the conduct of his previous supervisors when he was at Brooklyn APS. (Def. Mem. at 14-16; Pl. Opp'n at 13-14.) Based on the complete lack of evidence presented at trial regarding any compensatory damages--both economic and noneconomic--suffered by plaintiff as a result of defendant's alleged retaliatory conduct after August 12, 2003, the court would grant a new trial on the ground that the jury's $250,000 award of compensatory damages shocks the

judicial conscience, is a denial of justice, and must be set aside.

As defendant correctly argues, plaintiff presented no evidence at trial of any economic damages after August 12, 2003, such as lost salary, benefits, or overtime compensation, out-of-pocket expenses, or any other loss or costs attributable to defendant's alleged retaliatory conduct. (*See* Def. Mem. at 12; Def. Reply at 6-9 & n.1.) Nor does plaintiff dispute that he did not present any evidence regarding his salary at Brooklyn APS or Lombardi, or the difference in salary between his caseworker position at Lombardi and the Supervisor I position he sought for a promotion.[17] (Pl. Opp'n at 13.)

At most, based on Ms. Holt-Knight's testimony that a supervisor's salary at Brooklyn APS "could be 3,000 or more" than that of a caseworker (Tr. 533-34), the jury may have been able to infer that the salary of the Supervisor I position for which plaintiff interviewed, which was approximately $39,500 (Exhibit A to PX-5), was "$3,000 or more" than that of a

---

[17] Indeed, the only evidence of economic damages that plaintiff identifies is defendant's interview notice stating that the salary of the Supervisor I position at Brooklyn APS for which plaintiff interviewed in March 2004 was $39,542. (Pl. Opp'n at 13 (citing Exhibit A to PX-5).) Other than the notice and Ms. Holt-Knight's testimony above, the jury had no evidence before it regarding the salary of a caseworker, and thus had no way to calculate the difference between plaintiff's caseworker salary and the Supervisor I salary. Plaintiff would have had to resort to complete guesswork to determine the difference in salary between the Supervisor I position and plaintiff's caseworker position. Plaintiff also did not present any evidence of any other benefits associated with a Supervisor I position that he did not receive because he was not promoted.

caseworker.  Under a generous view of the evidence and the
phrase, "or more," had plaintiff proven his failure to promote
claim, he would have been entitled to between $3,000 and
possibly up to $10,000 per year in the salary differential
between his caseworker position and the Supervisor I position
for which he was not selected.  Applying a salary differential
of between $3,000 and $10,000 per year, for the one-and-a-half
years plaintiff was not promoted between March 2004, when he
first interviewed and was not selected for the Supervisor I
position, and September 2005, when his employment with the
defendant terminated, would result in a total of between $4,500
to $15,000 in economic damages.[18]

Assuming that plaintiff had proven a salary
differential between $3,000 and $10,000 per year for a total of
between $4,500 and $15,000 in economic damages for the one-and-
a-half years (which he did not prove), given the award of
$250,000, the jury must have awarded plaintiff between $245,500
and $235,000 in noneconomic or emotional distress damages, an

---

[18]  Plaintiff attempts to argue that the jury could consider the
entirety of the Supervisor I salary of approximately $40,000 as a loss
suffered by plaintiff "for an indeterminate length of time" and "w[e]ll in
excess of six years."  (Pl. Opp'n at 13.)  This argument, however, fails to
consider that plaintiff is only entitled to the difference in salary and
benefits between the Supervisor I and caseworker positions, and that
plaintiff would receive a windfall if he were awarded the entirety of a
Supervisor I salary.  Moreover, it is undisputed that the termination of
plaintiff's employment with defendant in September 2005 is not the subject of
this lawsuit and is only relevant to plaintiff's entirely separate ADA/FMLA
Lawsuit.  Thus, plaintiff cannot recover, at least not in this case, for any
loss of salary after September 2005 when he was no longer working for the
defendant.

amount far in excess of what is reasonable under the facts of this case and the law in this Circuit. As stated by the court in *Rainone* in analyzing emotional distress damages:

> In the employment discrimination context, . . . [t]he spectrum of damage awards ranges from $5,000 to more than $100,000, representing "garden-variety," "significant," and "egregious" emotional distress claims. "At the low end of the continuum are . . . 'garden-variety' distress claims . . . ranging from $5,000 to $35,000. 'Garden-variety' remitted awards have typically been rendered in cases where the evidence of harm was presented primarily through the testimony of the plaintiff, who describes his or her distress in vague or conclusory terms and fails to describe the severity or consequences of the injury. . . . The middle of the spectrum consists of 'significant' ($50,000 up to $100,000) and 'substantial' emotional distress claims ($100,000). These claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony or evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. Finally, on the high end of the spectrum are 'egregious' emotional distress claims, where the courts have upheld or remitted awards for distress to a sum in excess of $100,000. These awards have only been warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected."

388 F. Supp. 2d at 122-23 (quoting Michelle Cucuzza, *Evaluating Emotional Distress Damage Awards to Promote Settlement of Employment Discrimination Claims in the Second Circuit*, 65 Brook. L. Rev. 393, 427-28, 429 (1999)); *see also Kinneary v. City of New York*, 536 F. Supp. 2d 326, 331-32 (S.D.N.Y. 2008) (noting that garden-variety emotional distress claims "hover in the range

of $5,000 to $30,000" and stating that the evidence supporting

such claims "usually is limited to the testimony of the

plaintiff, who describes the emotional distress in vague or

conclusory terms, presents minimal or no evidence of medical

treatment, and offers little detail of the duration, severity, or

consequences of the condition." (internal quotation marks

omitted)). "To obtain emotional distress damages, a plaintiff

must establish actual injury and the award must be supported by

competent evidence in addition to a plaintiff's subjective

testimony." *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46

(E.D.N.Y. 2009) (internal quotation marks omitted).

The only evidence that plaintiff presented regarding

noneconomic damages or emotional distress after August 12, 2003

was his own conclusory statement that he was seeking medical

attention for chest pain and anxiety when he was supervised by

Ms. Preudhomme at Lombardi. (Tr. 129). Plaintiff, however, did

not present any medical evidence of those conditions[19] and

offered no detail regarding the causation, duration, severity,

or consequences of those conditions, the frequency with which he

sought medical treatment, or any medications that he was

_____

[19] Plaintiff appears to argue that he did not satisfy his burden
of providing medical evidence regarding plaintiff's non-economic damages
because the court "denied plaintiff the opportunity to offer [his] medical
evidence." (Pl. Opp'n at 14.) It was plaintiff, however, who failed to
oppose defendant's motion *in limine* to exclude medical evidence as irrelevant
to this case because the medical evidence plaintiff sought to introduce only
related to treatment of plaintiff's physical disability, which is the subject
of the ADA/FMLA lawsuit. *See Levitant*, 2011 U.S. Dist. LEXIS 20742, at *9.

prescribed.[20]  Like in *Kinneary*, this minimal evidence of

plaintiff's noneconomic damages "fall[s] far short of the type

of severe injury from extreme misconduct that would warrant the

exceptional award he obtained" in excess of $200,000.  *Kinneary*,

536 F. Supp. 2d at 332; *see also Annis v. Cnty. of Westchester*,

136 F.3d 239, 249 (2d Cir. 1998) ("[T]he only evidence of [the

plaintiff's] emotional distress--her own testimony--is

insufficient to warrant an award of compensatory damages for

that injury."); *cf. Zeno v. Pine Plains Cent. Sch. Dist.*, No.

10-3604-cv, 2012 U.S. App. LEXIS 24833, at *41-42 (2d Cir. Dec.

3, 2012) (finding record contained sufficient evidence to uphold

jury award where several witnesses corroborated the plaintiff's

emotional suffering and distress).  Indeed, plaintiff "did not

establish by medical evidence, for example, that he suffered

from extreme objective physical manifestations, that he sought

psychological or medical treatment, that any particular life

activities of his were curtailed due to the emotional distress,

---

[20]  Plaintiff also did not establish that his chest pain and
anxiety were proximately caused by Ms. Preudhomme's conduct at Lombardi, and
that he was not instead continuing treatment for the same conditions he
claimed were caused by the conduct of his supervisors at Brooklyn APS prior
to August 12, 2003.  Indeed, after the June 25, 2002 incident with Ms.
Kennedy, plaintiff testified that he had an anxiety attack and was diagnosed
with a heart palpitation.  (Tr. 87, 235.)  Subsequently, after the August 8,
2003 incident with Ms. Barnes and Ms. Brown, plaintiff testified that he
sought medical treatment and was diagnosed with high blood pressure, chest
pain, heart palpitations, and stress.  (Tr. 85, 88.)  It was plaintiff's
burden to establish that defendant's conduct after August 12, 2003
proximately caused his emotional distress, but no evidence of causation, not
even plaintiff's own testimony, was presented.

or that other circumstances prevailed which might differentiate his situation from the self-described garden variety non-economic damages situation." *Kinneary*, 536 F. Supp. 2d at 332.

Courts in circumstances similar to the instant action have found noneconomic damages in the six-figure range to be excessive where plaintiff has only established garden-variety damages, and such courts have ordered new trials unless the plaintiffs agreed to remit such awards to reasonable levels closer to the $30,000 level. *Id.* (collecting cases and ordering a new trial unless plaintiff agreed to a reduction of the emotional distress award from $125,000 to $25,000 where plaintiff felt embarrassed, disappointed, and upset from losing his job); *see also Rainone*, 388 F. Supp. 2d at 122-23 (ordering a new trial unless plaintiff agreed to a reduction of emotional distress damages from $175,000 to $50,000 where there was no evidence of physical manifestations of emotional distress, debilitating alterations in lifestyle, or permanency, but plaintiff's emotional distress was corroborated by his wife and he received treatment from a psychologist for four years and was diagnosed with major depression).

Accordingly, because plaintiff has failed to establish a significant amount of garden-variety noneconomic damages, let alone any "egregious" or "significant" noneconomic damages warranting an award in excess of $50,000, the court finds that

the jury's award of $250,000, between $235,000 and $245,500 of
which must have been for noneconomic damages or emotional
distress, is so excessive that it shocks the conscience, is a
denial of justice, and must be set aside.

C. **The Misconduct of Plaintiff's Counsel During Summation**

In combination with the above reasons for granting a
new trial, the court also finds that a new trial is warranted
because of plaintiff's counsel's misconduct during his closing.
"'Obviously not all misconduct of counsel taints a verdict to
such a degree as to warrant a new trial.' Only 'when the
conduct of counsel in argument causes prejudice to the opposing
party and unfairly influences a jury's verdict' is a new trial
warranted." *In re Fosamax Products Liability Litigation*, 742 F.
Supp. 2d 460, 477 (S.D.N.Y. 2010) (quoting *Pappas v. Middle
Earth Condo. Ass'n,* 963 F.2d 534, 540 (2d Cir. 1992)). In
determining whether to grant a new trial based on trial
counsel's misconduct, "the court must consider such a claim in
the context of the trial as a whole, examining, among other
things, the totality of the circumstances, including the nature
of the comments, their frequency, their possible relevancy to
the real issues before the jury, and the manner in which the
parties and the court treated the comments." *Id.* (internal
quotation marks omitted); *see also Matthews v. CTI Container
Transp. Int'l Inc.,* 871 F.2d 270, 278 (2d Cir. 1989) ("Trial

courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial.").

Here, plaintiff's counsel made several improper statements during his summation, many of which were in direct contravention of this court's prior rulings on motions *in limine* and at sidebar during trial: (1) counsel stated that plaintiff was suspended for two weeks (Tr. 763) when in fact there was no evidence presented at trial regarding the length of his suspension; (2) counsel stated that plaintiff's transfer from ACS to the defendant APS was "part of this discrimination against [plaintiff] to get him out of this agency" (Tr. 748), when the alleged discriminatory nature of that transfer was not a claim in this case and evidence regarding it had been excluded, *see Levitant*, 2011 U.S. Dist. LEXIS 20742, at *8-9; (*see also* Tr. 749-51); (3) counsel stated, "my client maintains that from the time that he was *illegally* terminated, and we feel he was" (Tr. 766) (emphasis added), which referenced plaintiff's termination claim that is not part of this case and that is the subject of a separate ADA/FMLA Lawsuit, *see Levitant*, 2011 U.S. Dist. LEXIS 20742, at *8-9; (*see also* Tr. 765-66); (4) with respect to the failure to promote claim, counsel stated that "there were people underneath [plaintiff] who eventually got promoted" (Tr. 761-62), which referenced irrelevant evidence that was excluded because it related to the promotion of an individual a significant

amount of time after plaintiff's employment with defendant had ended (Tr. 272-74); (5) counsel injected his personal opinion into his summation on numerous occasions (*see, e.g.*, Tr. 763 ("Mr. Levitant was suspended for two weeks, and I think it was unjust"); Def. Mem. at 19 (citing *Koufakis v. Carvel*, 425 F.2d 892, 904 (2d Cir. 1970))); and (6) counsel told the jury to award $1 million in compensatory damages (Tr. 766) when such an award clearly was not supported by the evidence and he did not explain the grounds for such a large award.

Most of the wholly improper conduct by plaintiff's counsel was objected to by defense counsel and addressed by the court through limiting instructions. Nonetheless, given the lack of evidence in the trial record, counsel's conduct in referencing facts that were not established by evidence at trial and conduct by the defendant that was not at issue in this case or had previously been excluded caused unfair prejudice to the defendant, inflamed the jurors, and aroused their sympathy.

Accordingly, the court finds that, in conjunction with the other grounds discussed above, the court would grant a new trial under Rule 59 if this court's decision to grant defendant's motion for judgment as a matter of law is reversed or vacated on appeal.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 is granted and this case is dismissed. Additionally, the court conditionally grants defendant's motion for a new trial under Federal Rule of Civil Procedure 59 in the event that the judgment entered by this court is later vacated or reversed. The Clerk of the Court is respectfully requested to enter judgment in accordance with this decision and to close this case.

**SO ORDERED.**

Dated:     December 13, 2012
           Brooklyn, New York

_____/s/_____

KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York